HENRY M. PICKLE and Another, Respondents, *v.* W. BERTRAM PAGE, Appellant.

Fourth Department, March 20, 1929.

*Albert W. Robbins*, for the appellant.

*John W. Hollis*, for the respondents.

CROSBY, J.  Plaintiffs are husband and wife.  Defendant was sheriff of Steuben county at the time of the transaction which is the subject-matter of this action.  A son of the plaintiffs, Lyall Pickle, married a young woman named Mabel Dewey in Cleveland, O., in December, 1918.  A son, Vernon Owen Pickle, was born to them November 24, 1919.  Thereafter Lyall Pickle and his wife and son came to live with Lyall's parents, the plaintiffs in this action, at Fremont, Steuben county.  Thereafter, and on August 24, 1920, Mabel Pickle abandoned her husband and nine months old son, and returned to her former home in Ohio.  She never came near either of them again until June 26, 1925, although her husband Lyall visited her in Ohio, tried to effect a reconciliation, and was served personally with a summons in a divorce action in Ohio.  He did not defend the action, and she secured a decree of the Ohio court granting her a divorce on the grounds of cruel and inhuman treatment, and the decree also provided, by its terms, that Mabel Pickle should have the custody of the infant son, Vernon.

On December 14, 1920, and before the date of the decree of divorce in Ohio, the plaintiffs in this action adopted the infant Vernon Pickle as their son, upon the personal appearance and

consent of the infant's father, Lyall Pickle, and the consent of the mother, Mabel Pickle, was dispensed with on account of her abandonment of the infant.

On June 25, 1925, nearly five years after she abandoned her infant son, Mabel Pickle came from Ohio to Steuben county, in an auto accompanied by her sister and the latter's husband. She brought with her a copy of the Ohio court's decree of divorce. She sought a writ of habeas corpus from a justice of the Supreme Court, who is now an associate justice of this court, but he informed her attorney that he preferred not to issue it as he was about to adjourn court and was going away and that he could not come back to the county to hear the return on the writ. Next she interviewed the defendant and asked him to accompany her and her party to the home of the plaintiffs to see her child and to secure his custody if possible. Defendant contends that he was persuaded to go along to enable Mabel Pickle to see the child and only after telling her there must be no trouble; and that he went along to insure the peace. It also appears that defendant was advised by the lawyer who had endeavored to secure the writ of habeas corpus, that it would do no harm for him to go along just to enable Mabel Pickle to see her son.

On June twenty-sixth defendant accompanied Mabel Pickle and her friends to the home of plaintiffs. The evidence fully supports the story of plaintiffs as to what happened after the party reached the Pickle home. Bertha E. Pickle recognized Mabel Pickle, and suspecting trouble refused to permit her and those with her to enter the house. Thereupon defendant exhibited his badge of office, said that he was sheriff of the county, declared that he had papers to serve upon Bertha Pickle and demanded entrance. Bertha Pickle thereupon admitted the party, and defendant started reading the Ohio divorce decree while Mabel Pickle and her sister forcibly removed the child to the waiting auto and drove away with him. Bertha Pickle made a gallant fight to retain custody of her foster child, but was forcibly restrained by defendant who caused her bodily injury to some extent. Bertha Pickle begged defendant to delay the kidnapping until she could show him her adoption papers, but he met her pleading with the statement that he did not believe she had any adoption papers; that there was no occasion for excitement; that the Ohio people had the child, had a right to his custody, and could never be compelled to surrender him once they were safely in the State of Ohio.

Further details of what happened on June twenty-sixth are found recited in the opinion in *People ex rel. Pickle* v. *Pickle* (215 App. Div. 38).

Mabel Pickle and her sister and the child were taken into custody in Buffalo as they were taking a lake boat to leave the State. A trial was had before the Special Term of Supreme Court in Buffalo on a writ of habeas corpus. The court awarded the custody of the child to Mabel Pickle and she left the State with the child. The order of the Special Term was reversed by this court and the validity of the adoption upheld. (*People ex rel. Pickle* v. *Pickle, supra.*)

In the present action the learned trial court granted a nonsuit against plaintiff Bertha E. Pickle, and plaintiffs acquiesce in that nonsuit. The jury awarded a verdict of $6,000 to plaintiff Henry M. Pickle against defendant, and this appeal is from the judgment entered upon said verdict.

Appellant raises three questions which need to be considered. The first is that the verdict was contrary to the weight of evidence. A careful reading of this record leads to the conclusion that the verdict was in accordance with the weight of evidence.

Appellant's second point is that he was acting as sheriff, in his official capacity, and that the action must have been commenced within one year of the transaction complained of. (Civ. Prac. Act, § 51.) It cannot be claimed that because a man happens to hold a public office, all his acts are necessarily of an official nature. At the request of defendant's counsel, the learned trial court charged the jury that it was a question of fact for them to decide whether or not defendant was acting in his official capacity, and the jury's verdict has settled that question. In view of defendant's request to have the jury decide this question as one of fact, he is in no position to complain either that the trial court did not decide it in his favor as a question of law, or that the jury, upon sufficient evidence, decided the matter adversely to him.

Appellant's third point is that the jury were permitted, by the trial court, to pass upon improper elements of damage. The trial court, by its charge, permitted the jury to consider four elements of damage, viz.: (1) Loss of services; (2) expenses incurred in efforts at recovery of the child; (3) mental anguish of the plaintiff, and (4) punitive damages. These various elements of damage will be considered in the order given.

As to loss of services little need be said, for, although there was no direct proof that the child in question ever did or ever could perform any services for plaintiff, the trial court charged the jury, in substance, that no more than nominal damages could be awarded under this head. Defendant took no exception to this portion of the charge, and made no request to charge under this head. Our attention has been called to no case in New York State in which damages have been sought in a civil action for kidnapping. But

in other jurisdictions it is held that loss of services, in a case like this, will be presumed. (*Magee* v. *Holland*, 27 N. J. Law [3 Dutch.], 86; *Clark* v. *Bayer*, 32 Ohio St. 299.)

Appellant lays particular stress upon the impropriety of permitting the jury to award damages for expenses incurred in an attempt to recover the child, after the erroneous decision of the Special Term and before that decision was reversed. The proof shows that $449.14 was expended before the Special Term decision was made, and $2,652.28 thereafter. A portion of the latter amount was expended in the successful effort to secure a reversal of the erroneous decision.

The rule is that when defendant did plaintiff a wrong he incurred liability for such damages as naturally and logically flowed from that wrong. Having set his wrong in operation he should pay such damages as a prudent person would anticipate from the nature of the wrong and from all the circumstances of the case. Now, is it correct reasoning to say that when the Special Term made an erroneous decision, awarding the child to Mabel Pickle, the defendant's wrong ceased to operate, and that an intervening wrong took its place and operated to account for all damage thereafter occurring? Is the Special Term's error analogous to an intervening negligence upon which defendant can rely to argue that his original wrong can no longer be said to be the proximate cause of the damage occurring after the intervention? It seems to me it was a question of fact for the jury to say, under all the circumstances of the case, to what extent and under what circumstances the plaintiff was justified in making effort and spending money to recover his child and to right the wrong defendant did him. Was it the natural and logical result of defendant's wrong that plaintiff should go on trying to recover his child even after the trial court had made an erroneous decision awarding its custody to another? That was for the jury to say, and they having found that plaintiff's expenses were naturally and logically caused by defendant's wrong, then it is of no consequence that the erroneous decision for a time prevented plaintiff from recovering his child. Erroneous judicial decisions sometimes become the law of a given case, but not the law of the land. The erroneous decision of the Special Term was not an intervening wrong; it was merely a failure to stop the operation of the defendant's original tort.

Damages have been allowed for expenses incurred in recovering a stolen horse and wagon (*Bennett* v. *Lockwood*, 20 Wend. 223); and in the State of Massachusetts this language of the trial court in a kidnapping case was approved: " that the plaintiff's duty was to make reasonable exertion for the recovery of his child, [and] to this

end it was his duty to incur reasonable expenses, while there was probable cause to suppose he could thus obtain possession of him * * * for such length of time as search might properly and reasonably be conducted with prospect of success, he might make reasonable and proper expenditures of money, which the jury are authorized to take as part of the damages sustained by the plaintiff." (*Rice* v. *Nickerson,* 9 Allen [Mass.], 478.) A verdict of $4,200, of which $2,200 was for money expended in search, was upheld.

Appellant also complains that the jury were allowed to consider the mental anguish of the plaintiff. It is true that our courts have held that where there is an injury, primarily to an infant, the parent cannot recover for injured feelings (*Cowden* v. *Wright,* 24 Wend. 429), but that is not our case here. Here the wrong committed is primarily an invasion of the plaintiff's rights. As before stated, we find no authority in our State for guidance as to the damages that may be awarded in a case of kidnapping. But in principle the instant case is not unlike the case where a plaintiff believed that defendant had returned to her a substitute for the ashes of her husband's body. The jury awarded her a verdict, but made a special finding that the correct ashes had been returned to plaintiff. The appellate court reversed the judgment on the theory that the special finding had destroyed the only foundation upon which a verdict could rest. But the court said: " If the jury had found that the plaintiff had been deprived of her husband's remains by reason of misconduct on defendant's part, then she would have been entitled to damages for injury to feelings proximately flowing from defendant's wrongful acts." (*Stahl* v. *Necker, Inc.,* 184 App. Div. 85.)

In the State of Massachusetts it is held that in a civil action for kidnapping recovery may be had for the mental anguish of the parent. (*Stowe* v. *Heywood,* 7 Allen [Mass.], 118.) The same is true in New Jersey. (*Magee* v. *Holland,* 27 N. J. Law, 86.)

We come now to the question of punitive damages. Such damages have been allowed in many forms of tort action — for trespass upon real property (*Sheldon* v. *Baumann,* 19 App. Div. 61); for conversion of a special interest in personal property (*Allaback* v. *Utt,* 51 N. Y. 651); for injury to personal property (*Woert* v. *Jenkins,* 14 Johns. 352); for wrongful levy by a sheriff (*Schuler* v. *Roberts,* 49 N. Y. St. Repr. 811; 21 N. Y. Supp. 27); for assault (*Conners* v. *Walsh,* 131 N. Y. 590); for breach of promise to marry (*Chellis* v. *Chapman,* 125 id. 214); for libel (*Warner* v. *Press Publishing Co.,* 132 id. 181); for false imprisonment (*Voltz* v. *Blackmar,* 64 id. 440); for malicious prosecution (*Brown* v. *McBride,* 24 Misc. 235); for

alienation of affections (*Warner* v. *Miller*, 17 Abb. N. C. 221), and in many other kinds of tort actions.

Of course punitive damages are allowed only where defendant, in committing his wrong, was actuated by malice. But malice does not mean hatred, and it may be inferred from unjustifiable conduct. Bouvier's Law Dictionary (Rawle's 3d Rev.) defines " maliciously " as meaning " with deliberate intent to injure." And it has been said by our Court of Appeals that " The act is malicious when the thing done is with the knowledge of plaintiff's rights and with the intent to interfere therewith. In a legal sense it means a wrongful act, done intentionally, without just cause or excuse." (*Lamb* v. *Cheney & Son,* 227 N. Y. 418, 422.)

Malice on the part of defendant was inferred from his conduct. But it is urged that punitive damages cannot be allowed in a parent's action for injury caused to an infant; that such damages can only be allowed in an action by the infant. The basis claimed for such contention is found in such cases as *Covert* v. *Gray* (34 How. Pr. 450) and *Tidd* v. *Skinner* (225 N. Y. 422). The latter case is recent and is binding upon us. It is an action by a mother against a druggist for selling plaintiff's infant son large quantities of a harmful and habit-forming drug. In its opinion the court stated: " In most of the States, including this State, such damages [punitive or exemplary] are allowed to the person *directly injured* in cases of wrong committed with malice or reckless disregard of the rights of others." The opinion further states: " The weight of reason and authority is in favor of confining the damages to be recovered in an action by a *third party* to compensation for the pecuniary injury actually sustained." (Italics mine.)

In the case of kidnapping the party " directly injured " is not necessarily the child. A case might easily be conceived wherein the child would be greatly benefited. A child too young to have any feelings in the matter, and stolen from a poor home and taken into a luxurious and cultured home might have little claim for damages, and a parent cannot be said to be bringing a " third party " action in such case. The injury is directly and primarily to the parent. The child, if old enough to have a choice, might even assent to the kidnapping, and the kidnapping might be prompted by love for the child rather than by malice toward the child. The child might have small claim for damages, punitive or otherwise; but what injury could be greater, more direct and more personal to a parent than the taking of his child? In *Tidd* v. *Skinner* the court was speaking of cases where the injury was directly and primarily to the infant, as in cases of assault and of negligence.

A case more nearly, though not precisely like the instant case, is

*Lawyer* v. *Fritcher* (130 N. Y. 239, 245). There a female child was enticed away from her parent by means of fraud practiced by defendant. The case was complicated by the subsequent debauching of the infant. But, in speaking of the cause of action the opinion states: "It is true the complaint charged debauchment and ill health as a consequence, as well as the taking of the servant from the master." But the opinion then goes on to say: "Whether the debauchment was proven or not, the taking away by the defendant was proven without any contradiction and this gave plaintiff a cause of action and a right to damages. In such cases the jury have the right to impose punitive damages in their discretion in addition to compensatory damages."

It has been claimed that the reason why punitive damages are not allowed to the parent in an action arising out of an injury to an infant child, excepting, of course, in actions for the seduction of a daughter, is that such damages are, or may be, included in the recovery in the infant's action growing out of the same injury; and it is further stated that the parent may recover punitive damages in a seduction case, for the reason, among others, that the injured daughter may not recover punitive damages, or any other. The argument is, therefore, advanced that, since, in a case like the instant case, the infant could have a cause of action for, say, assault or false imprisonment, in which he could recover punitive damages, therefore, the foster parent, the plaintiff, cannot recover such damages. The argument is not supported by the authorities. It is not true that the parent's right to recover punitive damages, in all cases, depends upon the inability of the infant to recover punitive damages growing out of the same transaction. It has been held that where an infant daughter was debauched, not by wiles and persuasion amounting to seduction, but by force amounting to rape, so that the infant would clearly have a cause of action for assault, and could recover punitive damages, nevertheless the father, in an action, in form *per quod servitium amisit*, could have punitive damages. (*Damon* v. *Moore*, 5 Lans. 454.)

In other jurisdictions we find cases exactly in point, and there find not only punitive damages allowed to a parent in an action for kidnapping an infant, but also all the other elements of damage, which the jury were permitted to allow in the instant case; that is, loss of services, injury to feelings and expense of search and recovery. (*Magee* v. *Holland*, 27 N. J. Law, 86; *Clark* v. *Bayer*, 32 Ohio St. 299; *Howell* v. *Howell*, 162 N. C. 283.) In some jurisdictions punitive damages are allowed to a parent even in so-called "third party actions;" that is, actions by the parent for injuries suffered directly and primarily by the infant. (*Prescott* v. *Robinson*, 74 N. H. 460;

*Klingman* v. *Holmes*, 54 Mo. 304; *Trimble* v. *Spiller*, 7 T. B. Mon. [Ky.] 394.) In third party actions, where the injury is primarily to the infant, punitive damages are not allowed to the parent in some of the States, including our own. (*Baltimore & O. S. W. R. Co.* v. *Keck*, 89 Ill. App. 72; *Black* v. *Carrollton R. R. Co.*, 10 La. Ann. 33, 38; *Bube* v. *Birmingham R., Lt. & Power Co.*, 140 Ala. 276; *Tidd* v. *Skinner, supra.*) In some of these cases the court confuses punitive damages with damages for mental anguish. (*Black* v. *Carrollton R. R. Co., supra; Trimble* v. *Spiller, supra.*) We find this in the case last cited: The jury having found loss of services, were authorized to award damages for the injured feelings of the parents, that is vindictive or exemplary damages, etc.

The two kinds of damages should be kept distinct. And in this State it has been uniformly held that where the result of a wrong is an injury directly and primarily to an infant the parent cannot recover punitive damages in his action. In the absence of any authority in this State to the contrary we hold that in kidnapping cases the injury is primarily and directly, and indeed chiefly, to the parent, and that punitive damages may be allowed. The leading authorities in other States encourage that conclusion.

The verdict was moderate in amount, and there was no error committed that calls for reversal.

The judgment and order appealed from should be affirmed, with costs.

All concur. Present — SEARS, P. J., CROUCH, TAYLOR and CROSBY, JJ.

Judgment and order affirmed, with costs.