## INGO v. KOCH et al.
### No. 122.

Circuit Court of Appeals, Second Circuit.
April 15, 1942.

Elihu D. Sarasohn, of New York City (Isidor Lazarus and Joseph P. Fiori, both of New York City, of counsel), for plaintiff-appellee-appellant.

William A. Davidson, of White Plains, N. Y. (Francis J. Morgan, of Yonkers, N. Y., and John A. Krug, of White Plains, N. Y., of counsel), for defendants-appellants-appellees Koch, Casey, Toucher and Bassett, and appellee Mathews.

Arthur H. Ellis, of Mount Vernon, N. Y., for defendant-appellee Schmidt.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Long before she was imprisoned and the present action was begun, plaintiff had brought suit for seduction and breach of promise against one Dienst, a police lieutenant of Mount Vernon, a city in Westchester County, New York, in which she had charged among other things, that, to procure his promotion from the position of policeman to police lieutenant, she had given him $1,000 to bribe an unknown official of Mount Vernon. Koch, one of the defendants in the present action, is a resident of Mount Vernon; the others are all officials of Westchester County. Her imprisonment occurred when a new trial of her suit against Dienst was about to com-

mence. In the instant case, there was testimony that Dienst had threatened that, if plaintiff told anyone he had promised to marry her or that she had given him money, he would see that she was put in "a crazy institution."

Plaintiff's arrest and imprisonment was the result of her indictment, for assault in the third degree, in the case of People v. Ingo, on January 28, 1936, by the grand jury of Westchester County. That apparently there were insubstantial grounds for that indictment appears from the following memorandum, dated four months later, prepared and put in the files of that case by the assistant district attorney then in charge of it: "Re: People v. Jennie Ingo. This case is to be transferred[1] for the following reasons: That it appears that the complaining witness, Eugene Granata, was the aggressor in this alleged assault. The complaining witness went for the son of the defendant, who is a woman weighing less than 150 pounds, whereas the complaining witness weighs something over 200 pounds, and there are grave doubts as to whether or not the jury would convict in this case from an analysis of all of the surrounding circumstances. Consequently, it would seem in accordance with the dictates of reason and common sense that this office would not be warranted in putting the taxpayers of Westchester County to the expense of a trial of such a character where a jury would be inclined to favor the defendant under the circumstances of the alleged assault." Nevertheless, the proceedings were not then dropped; even in 1940, the district attorney opposed Mrs. Ingo's motion to dismiss, and it was not until 1941 that, on her motion, the court dismissed it "for want of prosecution"; at the trial of the case at bar, the trial judge said that no satisfactory explanation of this conduct had been given.

On the day of plaintiff's indictment, the district attorney issued a bench warrant directed to any peace officer of the State of New York which commanded him to arrest the plaintiff and bring her "before the Supreme Court to answer the indictment," or if the court had adjourned for the term to deliver her into the custody of the Sheriff of Westchester County, or if she require it, to take her before any magistrate in the county to give bail to answer the indictment. The bench warrant was given to the sheriff's office for execution, and on the

---

[1] The testimony showed that this meant the case was not to be prosecuted.

next day deputy sheriff Koch went to Police Headquarters in Mount Vernon and had the defendant Emma H. Schmidt, a policewoman connected with the Police Department of the City of Mount Vernon, assigned to go with him. Koch took the plaintiff directly to the Westchester County Jail, accompanied by Miss Schmidt, and there turned her over to the defendant Deputy Warden Bassett, who placed her in a cell.

Instead of taking her directly to the jail at Eastview, the deputy sheriff Koch should have taken her before the judge, then sitting in White Plains, in accordance with the terms of the bench warrant. There is testimony that, when the automobile used for her arrest turned from the road leading to White Plains to the road leading to the jail at Eastview, the plaintiff protested.

She testified also that, when she was in the jail, she protested against what she believed to be her wrongful treatment. On the basis that she was creating a disturbance, the defendant Dr. Mathews, who was an interne at Grasslands Hospital, and at the time was making his rounds in the jail, was asked by Warden Toucher to examine her. He did so and issued a certificate that she was "suffering from a paranoid state and is in such a state of health that she requires immediate treatment and should be removed to a hospital for such treatment." This certificate was presented to the County Judge who, on January 29, 1936, made an ex parte order that she be transferred to Grasslands Hospital. Section 508 of the Correction Law, Consol. Laws, c. 43, required that the certificate be signed by the jail physician and the warden, but it was signed solely by Dr. Mathews who had been assigned to the jail clinic during the month of January, 1936, as "Acting Jail Physician," in the absence of the jail physician. The plaintiff was transferred to the hospital, where she remained until February 26, 1936, when she was returned to the jail and bailed out.

There is in evidence a form prepared by the district attorney of an application to be presented to the county judge for plaintiff's removal from the county jail to the Grasslands Hospital, because of unsound mental condition. While this particular form (contemplating examination by two qualified medical examiners) was not used, it is significant that it was dated the day before her arrest.

Although plaintiff may not have proved that any of the defendants were parties to procuring her indictment, or that there was any unlawful conspiracy relating to the indictment, or that it was specifically in order to frustrate her suit against Dienst that any of the defendants had exceeded their authority,[2] there was evidence sufficient to justify a jury in believing that, after she had been indicted, the defendants, or some of them, when engaged in arresting her, and subsequently, were actuated by a personal ill-will and malice directed against her because of her suit against the police lieutenant Dienst and her charges, in that suit, of corruption by him and another Mount Vernon official. At one point in the trial, in the case at bar, the judge said, "It is possible that there may have been political activity and matters of that sort." With that background of fact, we turn to the questions before us.

1. As to the defendants Schmidt and Mathews, the verdict in their favor must stand, for the jury was justified, on the evidence adduced, in finding that they were not parties to the wrongful acts of the other defendants.[3]

---

[2] At the end of the trial, the judge dismissed, for failure to make out a prima facie case, her second cause of action, in which she expressly charged an extensive conspiracy of that sort, including a conspiracy to procure the indictment. But he refused to strike out the evidence as to Dienst (except that relating to the trial in plaintiff's suit against Dienst), saying that it bore on the amount of damages with reference to the issue of malice.

[3] Miss Schmidt testified that she accompanied the plaintiff to the jail in the police-car as a police-matron and after the arrest was made by the deputy sheriff Koch, that she had no part in the arrest or confinement, since she remained at the jail only a few minutes and then left the prisoner. On this testimony, which the jury was entitled to and evidently did believe, Miss Schmidt had nothing to do with the prisoner's arrest and had no control over her detention.

Dr. Mathews examined plaintiff only because requested to by the warden of the jail. He is not shown to have been aware that the certificate was to have been used to obtain an order to transfer the plaintiff to the hospital without the further signature of the warden. Consequently, he neither took part in any false imprisonment in the hospital nor intended to cause her confinement in the hospital without an order based upon a proper certificate.

■ *2. Were it not for the statute* of limitations, the verdict against the other defendants would stand. For, from the moment when there was a departure from the terms of the warrant, the plaintiff's arrest became unlawful (Cf. Snead v. Bonnoil, 49 App.Div. 330, 63 N.Y.S. 553; Hendrix v. Manhattan Beach Development Co., 181 App.Div. 111, 117, 168 N.Y.S. 316), entirely aside from any improper intent or purpose on the part of the defendants.[4] A jury, characterized by the experienced trial judge as "very intelligent," has found them liable under instructions which, with but one exception, were proper. The jury having so found, we must take it as a fact. Indeed, these defendants on this appeal virtually admit that their conduct was unlawful, resting their defense primarily on the ground that the action was barred by the New York statute of limitations,[5] relating to actions brought against sheriffs, which reads as follows: "The following actions must be commenced within one year after the cause of action has accrued: 1. An action against a sheriff or coroner upon a liability incurred by him by doing an act in his official capacity or by omission of an official duty; except the non-payment of money collected upon an execution." Plaintiff, on the other hand, relied on the two-year statute in false imprisonment cases. Civil Practice Act, § 50.

This action was instituted more than a year and less than two years after the imprisonment. The trial court ruled that the false imprisonment statute governed (i. e., that the short statute was not applicable), and submitted the case to the jury. In so doing, he erred. He should have ruled that that statute barred the action, unless the jury found that the defendants, in the deviation from the commands of the bench warrant, were not acting with a bona fide intention to carry out their official duties. As we reverse for a new trial as to those defendants against whom the jury returned a verdict, it is important that we state the proper interpretation of the one-year statute.

■ We have in this case an instance of an age-old type of contest—one between a citizen and peace officers who exceed their powers. Protection of the citizen requires that he be not molested by such officers except pursuant to the precise terms of lawful, official authority. On the other hand, enforcement of the state's orders requires that its officers be protected from excessive harassment so that they will not be paralyzed by fear in discharge of their functions; the enactment of such legislation as the short statute—the equivalent of which is found in many jurisdictions—was doubtless inspired by a policy of that sort. But, in so recognizing, we must also observe that the New York legislature could not have intended to terminate, at the end of the short period, the liability of sheriffs for any and every kind of unlawful action. The statute carefully avoids so providing. It relates only to "liability incurred by * * * doing an act in his official capacity or by omission of an official duty." This, of course, does not mean "official" in the sense of being lawful and non-actionable, for obviously there would be no need to provide any statute of limitations for lawful conduct. The result is that we have a sort of heaven-purgatory-hell classification: (1) Conduct which is lawful and not actionable, because entirely within the sheriff's official authority. (2) Unlawful conduct, actionable, but sufficiently close to being "official" so that suit is barred if not brought within one year. (3) Unlawful conduct, so far from being "official" that, for purposes of the statute of limitations, it is treated like that of an ordinary non-official person. As the jury found, on sufficient evidence, that the conduct here was unlawful, the sole issue is whether it falls within the second or the third category.

---

[4] The judge directed a verdict, saying "when she was confined in the jail and the doors closed upon her, a cause of action in her favor arose against each person who participated, aided and abetted in that incarceration." This was a proper instruction, since the evidence was undisputed. As to the amount of damages, the trial judge correctly charged that the responsible defendants would be liable for the damage and suffering caused by confinement not only in the jail, but also in the hospital if the original wrong in taking her to jail before arraignment started "a chain of circumstances that led inevitably, reasonably and naturally to the confinement of Mrs. Ingo in the Grasslands Hospital." He was also correct in charging the jury that "If you find that these officers acted maliciously and out of hatred and detest of Mrs. Ingo, you can increase the damages that you would otherwise give if you found that they acted in good faith."

[5] New York Civil Practice Act, § 51.

672

We face a problem of line-drawing.[6] What is the correct rationale for drawing the line?

Analogies from other legal areas suggest that the intent or purpose of the defendants may be the controlling factor.[7] As Walton says, "there are cases in which the motive makes all the differences * * * This is so in malicious prosecution, in libel where there is a qualified privilege, in interfering with business, in inducing a breach of contract, or in preventing a man from obtaining employment."[8] It is customary today to describe such cases in terms of "privilege": conduct which, usually, would be actionable, as an invasion of an interest legally protected because regarded as socially desirable, is, in some circumstances, when it furthers a more important interest, accorded the privilege of immunity from liability. Many a privilege, however, is conditional: the privilege vanishes, being abused, if the purpose or intent of the conduct is not to further the interest which is the basis of the privilege.[9]

■ We might, then, expect to discover, as we do, that the New York courts have employed substantially that approach in construing the short statute of limitations. If we use the language of the "privilege" analysis, the rule may be stated as follows: (1) When a sheriff acts within his authority in seizing property or arresting a person, his conduct is privileged, i. e., immune from liability. (2) Where he exceeds his authority, he loses that privilege, and his conduct is actionable. (3) But he then has a secondary privilege, under the short statute, to be free of liability if suit is not brought within a year. (4) That secondary privilege, however, does not exist if the sheriff, when engaged in his unlawful conduct, knew that he was not acting officially, i. e., did not have an intent or purpose to carry out his official duties.[10]

The New York courts, when they first adopted that interpretation of the short statute, came at the result somewhat indirectly, through an intermediate concept: They said that the aim of the statute as originally enacted in 1828 (with a three-year period) was to favor the sheriff's

---

[6] Irwin v. Gavit, 268 U.S. 161, 168, 45 S.Ct. 475, 69 L.Ed. 897; Harrison v. Schaffner, 312 U.S. 579, 583, 61 S.Ct. 759, 85 L.Ed. 1055; Pearce v. Commissioner, March 9, 1942, 62 S.Ct. 754, 86 L.Ed. ——; Holmes, Law in Science—Science in Law, 12 Harv.L.Rev. (1899) 443, reprinted in Holmes, Collected Legal Papers (1920) 210, 232-233; cf. Holmes, The Common Law (1881) 68, 110, 127; Cardozo, The Nature of The Judicial Process (1921) 46, and The Paradoxes of Legal Science (1928) 62; Fleming v. Arsenal Building Corporation, 2 Cir., December 30, 1941, 125 F.2d 278.

[7] For instance, a man may ruin the business of another, without liability, if he does so by setting up a competitive business; however, he incurs liability if his purpose was solely that of damaging his rival. Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.,N.S., 599, 131 Am.St.Rep. 446, 16 Ann.Cas. 807; American Bank & Trust Co. v. Federal Reserve Bank, 256 U.S. 350, 41 S.Ct. 499, 65 L.Ed. 983; Beardsley v. Kilmer, 236 N.Y. 80, 140 N.E. 203, 27 A.L.R. 1411; Holbrook v. Morrison, 214 Mass. 209, 100 N.E. 1111, 44 L.R.A.,N.S., 228, Ann.Cas.1914B, 824; 3 Restatement of Torts, §§ 708-709; Deon v. Kirby Lumber Co., 162 La. 671, 111 So. 55, 52 A.L.R. 1023; Glover v. Malloska, 238

Mich. 216, 213 N.W. 107, 52 A.L.R. 77; Huskie v. Griffin, 75 N.H. 345, 74 A. 595, 27 L.R.A.,N.S., 966, 139 Am.St.Rep. 718; Alabama Power Co. v. Ickes, 302 U.S. 464, 477, 485, 58 S.Ct. 300, 82 L.Ed. 374; Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1 (1894), Collected Legal Papers (1920) 117; Ames, Tort Because of Wrongful Motive, 18 Harv.L.Rev. 414 (1905); Paul, Selected Studies in Taxation (Second Series, 1938) 225.

[8] Walton, Motive as an Element in Torts, 22 Harv.L.Rev. (1909) 501, 518. Cf. Aikens v. Wisconsin, 195 U.S. 194, 203, 25 S.Ct. 3, 49 L.Ed. 154; American Bank & Trust Co. v. Federal Reserve Bank, 256 U.S. 350, 359, 41 S.Ct. 499, 65 L.Ed. 983.

[9] See Fowler, The Law of Torts (1933) §§ 9, 46, 55, 61, 227-234, 268-276. That work contains an admirably lucid summation of the privilege thesis. See also Holmes, loc. cit.; cf. Restatement of Torts, Chapters 5 and 34.

[10] The existence of a non-official intent will not destroy the sheriff's primary privilege of immunity from suit for acts done entirely within his official duties. Thus if a sheriff, under a valid writ, arrests a man and complies with the writ, the interest of efficient governmental operation requires that the sheriff be not liable merely because he has a personal grudge against the man arrested.

sureties so that the test in determining whether the short statute applied was held to be the same as that which would have been used in determining whether the sureties, had they been sued, would have been liable. See, e. g., Morris v. Van Voast, 1838, 19 Wend., N.Y., 283.

The question of the meaning of the short statute early arose in suits against sheriffs who, acting under valid writs of execution or attachment directing the seizure of property of execution debtors, unlawfully took the property of persons not named in the writ. It was said that the sureties would not be liable in such circumstances, and that, for that reason, the short statute did not apply to such a trespass. Morris v. Van Voast, supra; Ex parte Reed, 1843, 4 Hill, N.Y. 572. But in People v. Schuyler, 1850, 4 N.Y. 173, on similar facts, in a suit against a sheriff's surties, they were held liable.

Then, in Dennison v. Plumb, 1854, 18 Barb., N.Y., 89, on the basis of the ruling in the Schuyler case, the court (concluding that, on the facts before it, the sureties, if sued, would have been held) applied the short statute in a suit solely against a sheriff. The test announced in the Dennison case, to determine whether the short statute applies, was this: Has the plaintiff shown that the sheriff acted in bad faith, knowing that he had no right to seize the property? "In short," said the court, " * * * where the officer has assumed to act as an officer, and has acted in good faith, believing that he had authority to do the act, the statute has been applied * * *. Apply the same rule to the present case. There is no pretence that the deputy of the defendant Plumb acted otherwise than in good faith, believing he had a right, under the execution * * * to take the property * * *. He assumed to act as a public officer; he had a valid execution. * * * He was a trespasser because he took the property of the plaintiff instead of Robinson, but there is no evidence to show that he acted mala fide." The court cited English cases which had employed the same criterion in construing similar legislation. One of those cited cases was Daniel v. Wilson, 5 T.R. 1, 101 Eng.Rep. 1, an action for an assault committed by an excise officer. The court held that he was entitled to notice under a statute requiring, "that no writ shall be sued out against, nor process served on, any officer of excise, for anything done in the execution, or by reason of his office, until after a month's notice in writing"; the defendant excise officer had, while pursuing smugglers (which was part of his duty) assaulted an innocent person whom, in good faith, he suspected to be a smuggler. The court, in deciding that the one-month's statutory notice was required, said " * * * though the defendant's conduct * * * was perhaps too hasty, yet it manifestly appears that he acted in the supposed execution of his office, however illegally."

Ballinger v. Ferris, 1 M. & W. 628, 150 Eng.Rep. 586, is a similar case under a similar statute. There a constable arrested a person believing, bona fide, that he had committed a criminal offense; the court held that the constable, when sued for trespass, was entitled to notice under the statute, saying "We should take away the protection given by the statute, if we were to say that where there is a doubt as to the authority of the party, but none as to his motives, he should not have the opportunity which the legislature designed to give him, of tendering amends. The very purpose for which the act gives him that opportunity supposes him unable to justify the facts; he requires notice that he may tender amends." Thus the existence of the privilege (of receiving notice) depends on whether the officer in good faith intended to act in the discharge of his duties. In a similar case, Bird v. Gunston, 4 Dougl. 275, 99 Eng.Rep. 878, an action against a justice of the peace (acting ministerially) for trespass for wrongfully seizing property, Lord Mansfield said: "When the justice thinks he is acting, and means to act, in the execution of his office, it is sufficient, otherwise the protection held out by the Statute of Geo. 2 would be nugatory. A man wants no protection when his conduct is strictly right. The intention of the month's notice was to enable magistrates to tender amends when they find they have made a mistake. Here the defendant thought himself authorized by the Act of Parliament."

French law[11] is not without interest here. For an act done in excess of his official powers (faute de service), a government officer (a policeman, for instance) is ordinarily not personally liable to an injured citizen, but there is such liability for such acts in some circumstances (faute personelle). The test is seemingly whether or

---

[11] In pre-Nazi days.

not the officer "bona fide attempted to carry out his official duty." [12]

In Cumming v. Brown, 1871, 43 N.Y. 514,[13] the highest court of New York cited Dennison v. Plumb with approval. Its rationale was thus adopted as authoritative.

In New York cases decided since then, involving sheriff's sureties, no reference has been made to decisions relating to the short statute, and, reciprocally, in subsequent cases involving the short statute, nothing has been said of the surety cases. It may well be, therefore, that the test in the two types of cases is no longer interchangeable. The early suggestion of interchangeability rested, at best, on a rather slender base, and the short statute of limitations does not even mention sureties. Moreover, a differentiation between the two tests—that applicable under the short statute and that applicable when the question is as to the liability of sureties—is in line with developments, since the early New York cases were decided: In several states it has been explicitly held that the replacement of personal bondsmen by commercial sureties has resulted in a widening of the liability of a sheriff's sureties,[14] and it is not unlikely that there has been a similar development in New York. But no similar considerations would justify a widening of the application of the one-year statute of limitations.

■ However that may be, all the New York cases dealing with the short statute fall into line with the rationale announced in Dennison v. Plumb which, to repeat, is as follows: Did the sheriff, although acting unlawfully and therefore rendering himself liable, intend in good faith to carry out his official duties, or did he know that he was acting outside his official authority? Thus if the sheriff, directed to seize the goods of Jones, carelessly but in good faith levies on the property of Smith, he will enjoy the benefit of the short period of limitations. But if he has no desire or intention to obey the terms of the writ, but, instead, deliberately seizes the goods of Smith, knowing that the writ does not call for that seizure, he cannot be accorded the advantage (the privilege) of the short statute, because it cannot reasonably be said that an act done with full awareness that it is not officially authorized is "an act in his official capacity." Absent adequate evidence to the contrary, it will be assumed that his intent was bona fide.

The first New York case, involving the short statute, which arose after Dennison v. Plumb, was Board of Supervisors of Kings County v. Walter, 1875, 4 Hun, N.Y., 87, an action against a sheriff for presenting to the county, and procuring payment thereof to himself, fraudulently padded accounts for the board of fictitious prisoners. In rejecting the short statute as a defense, the court said that the sheriff's act was not done "in his official capacity, and by virtue of his office. * * * It is a fraud of the gravest description * * *. The short statute of limitation (one year) for acts honestly done by sheriffs by virtue of their office, could not have been intended to cover up such a case." [15]

The next case involving the short statute was Pickle v. Page, 1929, 225 App.Div. 454, 233 N.Y.S. 461, 463, aff'd 252 N.Y. 474, 169 N.E. 650, 72 A.L.R. 842. There the plaintiffs, residents of Steuben County, New York, had adopted a child upon his abandonment by his mother, Mabel Pickle, plaintiffs' daughter-in-law. Subsequently, Mabel Pickle procured a divorce in Ohio under a decree which provided that she should have custody of the child. She then came to New York with a certified copy of the Ohio decree and sought, but did not obtain, a writ of habeas corpus for the possession of the child. Thereupon, to quote the Appellate Division, she "interviewed the defendant [sheriff of Steuben County] and asked him to accompany her * * * to the home of the plaintiffs to see her child and to secure

---

[12] Cf. Dicey, Law of The Constitution (8th ed. 1914) 394, note 2, 399 note 1; Seagle, The Quest for Law (1941) 335; Garnet, French Administrative Law, 33 Yale L.J. (1924) 597. Formerly only the officer was responsible for a faute personelle but later both the officer and the state were held liable. Borchard, Governmental Responsibility in Tort, 28 Col.L.Rev. (1928) 734, 747, 748.

[13] That was a suit against the sheriff's sureties where the sheriff mistakenly seized the property of the wrong person. The court cited as authoritative both the Schuyler and the Dennison cases, thus accepting the latter as a correct statement of the then interchangeable standard.

[14] See, e.g., State of Missouri ex rel. and to Use of De Vault v. Fidelity & Casualty Co., 8 Cir., 107 F.2d 343, 349, as to such a change in Missouri.

[15] The court did not there consider whether the sheriff's sureties would have been liable, had they been sued.

his custody, if possible. Defendant contends that he was persuaded to go along to enable Mabel Pickle to see the child, and only after telling her there must be no trouble; and that he went along to insure the peace. It also appears that defendant was advised by the lawyer, who had endeavored to secure the writ of habeas corpus, that it would do no harm for him to go along just to enable Mabel Pickle to see her son." He then accompanied her to the home of the plaintiffs who refused to allow Mabel Pickle to enter the house. Thereupon the defendant practiced a fraud: Although, according to his own testimony, he had accompanied Mabel Pickle merely to enable her to see her child, and therefore knew that he had nothing to serve, he now exhibited his badge to plaintiffs, told them he was the sheriff, declared that he had papers to serve on them, and demanded entrance. By this trick, he and Mabel Pickle gained admission. The defendant then started reading to the plaintiffs the Ohio decree, while Mabel Pickle forcibly removed the child and drove away with him. One of the plaintiffs was physically restrained by defendant, who told her that Mabel Pickle had a right to the child's custody, and could never be compelled to surrender him when she and the child were safe in Ohio. The Appellate Division, calling defendant's action a "kidnapping," held the one-year statute inapplicable.

It is suggested that the ground of that decision is that the sheriff, in effect, acted under no writ whatever. But there is little difference between a case where a sheriff acts without a valid writ and one where, having a writ directing him to seize the property of A, an execution debtor, he seizes the property of B, concerning whom the writ is silent; for, as to B, he has no writ whatever. Indeed, it was on that ground that, in the early New York cases,[16] the one-year statute was not applied to such facts. But the Dennison case overruled those early decisions as to situations where the plaintiff failed to show that the sheriff, unprotected by his writ, had not in good faith intended to act officially. It may be, then, that in Pickle v. Page, we have a typical case a la the Dennison rule; for, patently, the sheriff in the Pickle case knew he was not acting in his official capacity. But, no matter how the Pickle case is explained, it is not at variance with the rationale set forth in the Dennison case.[17]

In Politano v. Jacoby, 264 N.Y. 686, 191 N.E. 627, the sheriff had lawfully arrested the plaintiff, but held him beyond the period fixed in the order pursuant to which he was acting. The court held, without opinion, that the one-year statute applied. The case came up on a motion for summary judgment. Examination of the pleadings and accompanying papers shows that there was no charge and that there were no facts showing or suggesting that the sheriff did not believe that he was complying with the writ; it was a case of a mistake made in good faith. Accordingly, under the Dennison rationale, the one-year statute properly governed.[18]

In Wiener v. Ellrodt, 268 N.Y. 646, 198 N.E. 537, the facts were these: Wiener had sued a Mrs. Ravekes; the sheriff had served the papers on her husband, Mr. Ravekes, who had promised to deliver them to his wife; the return as filed, had incorrectly shown service on Mrs. Ravekes. On that service, Wiener had obtained a judgment

---

[16] Morris v. Van Voast, supra; Ex parte Reed, supra.

[17] If the test were still the same as that used in the surety cases, the result in the Pickle case would be in accord with the rulings as to sheriff's sureties in many (not all) other jurisdictions. Even in Missouri, where, as previously noted, the liability of sheriffs' sureties has been widened, it is said that they are not liable for acts done outside his authority if "it is apparent he made a pretext of his authority to gratify personal malice or accomplish a personal end." State ex rel. Brennan v. Dierker, 1903, 101 Mo.App. 636, 74 S.W. 153, 155. And see Towle v. Matheus, 130 Cal. 574, 62 P. 1064; Rischer v. Meham, 11 Ohio Cir.Ct.R. 403; Butts v. Brown, 33 N.C. 141. There are other cases in which the sureties were exculpated where the officer was engaged in "a private mission" of his own; cf. City of Cambridge v. Foster, 195 Mass. 411, 81 N.E. 278; Truog v. American Bonding Co., 56 Ariz. 269, 107 P.2d 203; State to the Use of Williams v. Dayton, 1905, 101 Md. 598, 61 A. 624; State v. Mankin, 68 W.Va. 772, 70 S.E. 764, 765, 767; Wieters v. May, 71 S.C. 9, 50 S.E. 547, 548, 549; De Sisto v. Stimmel, 58 App. Div. 486, 69 N.Y.S. 431; Rice v. Penfield, 49 Hun, N.Y., 368, 2 N.Y.S. 641.

[18] If it were still necessary in New York to apply the test of the surety's liability, the decision would be correct, for the sheriff's act, mistakenly in excess of his authority, is precisely the sort of misconduct for which a sheriff's bondsmen are liable.

against Mrs. Ravekes which, however, had later been set aside, for the defect in the service, at a time when a new suit against Mrs. Ravekes was barred. Wiener then sued the sheriff, who pleaded the one-year statute. The case came up on motion for summary judgment. Neither in the pleadings nor in the accompanying papers was it charged or even by implication suggested that the sheriff, in making the incorrect return, had not in good faith intended to perform his official duties. The court, without opinion,[19] decided for the sheriff.

The decision in the Ellrodt case,[20] as in all the other New York cases, is thoroughly in accord with the rule laid down in Dennison v. Plumb. There is no reason, then, for believing that such is not still the New York rule as to the interpretation of the short statute.

As stated above, since 1871, the New York courts, in interpreting the short statute of limitations relating to suits against a sheriff, have not said that the pertinent test is the same as that to be applied in determining whether the sheriff's sureties, if they had been sued, would have been held liable. Recent New York cases involving the liability of such sureties are, therefore, it would seem, irrelevant. Assuming, however, that they are pertinent, it is argued that Eckstein v. Massachusetts Bonding & Ins. Co., 281 N. Y. 435, 24 N.E.2d 114, 117, 125 A.L.R. 1143, shows that our views as to the New York courts' interpretation of the short statute of limitations is erroneous. But in the Eckstein case, the sureties were held not to be liable because the court held that the sheriff himself was not liable. The facts were as follows: One Esther Siegel had obtained a judgment against certain debtors and their property had been sold pursuant to the resultant execution. The execution sale had been conducted by a New York City marshal. The plaintiffs, at the time of this sale, were mere unsecured creditors of the debtors, having no lien of any kind on any of the debtors' property. Later they obtained a judgment against the debtors. They then sued both the marshal and his surety, alleging that the marshal, in carrying out the execution sale under Esther Siegel's execution, had, in several respects, failed to comply with the statutes relating to execution sales, the irregularities even going so far as perhaps to involve some fraud. The defendants moved to dismiss the complaint; a judgment granting this motion was sustained. The Court held that since, at the time of the sale, plaintiffs were unsecured creditors of the debtors, the officer owed them no duty which he had violated, even if he conducted the sale improperly; and since the officer was not liable to plaintiffs, of course his surety could not be. The court said: "No property interest or established right of the plaintiffs was affected by the alleged misconduct of the marshal nor do the plaintiffs charge the marshal with any fraudulent conduct in connection with the sale and affecting any of their rights. No statutory duty was imposed on the marshal as to simple creditors without lien on or a fixed interest in the property sold except that imposed by section 695 of the Civil Practice Act, which has no application here. * * * Liability of the appellant [the surety] is as great but no greater than that of the marshal while acting in an official capacity. 21 R.C.L. 974; People ex rel. Metcalf v. Dikeman, 4 Keyes 93, 105, *43 N.Y. 93. No liability was imposed upon the marshal under the pleadings in this case." The court also discussed the following argument advanced by plaintiffs: The surety bond, similar to that of sheriffs,

---

[19] As a consequence, the facts must be obtained from the record and from Wiener v. Ravekes, 241 App.Div. 774, 270 N.Y.S. 536, as they are not adequately stated in the summary prepared by the Reporter.

[20] If the test were still whether the sureties, if sued, would have been liable, the Ellrodt case would be in accord with the New York decisions on that subject, which sustain an action against a sheriff's sureties in such circumstances. See Walter v. Middleton, 68 N.Y. 605.

It should also be noted that, in Wiener v. Ellrodt, the plaintiff virtually conceded that the one-year statute was applicable, and argued principally that the action was not barred because the statute did not begin to run when the officer falsely certified but only when the court subsequently decided that the service as made was defective. This is a question on which the decisions in divers jurisdictions are not in accord. The leading case, McKay v. Coolidge, 218 Mass. 65, 105 N.E. 455, 52 L.R.A.,N.S., 701, Ann.Cas.1916A, 883—to the effect that the statute runs from the date when the certificate is made—was cited to the court in the Ellrodt case; an earlier New York decision had previously been to like effect. Peck v. Hurlburt, 46 Barb., N.Y., 559. The court, in the Ellrodt case, presumably decided the case on that ground.

made the sureties liable if the officer did not "well and faithfully perform and execute the duties of the office of constable, without fraud, deceit, or oppression"; those provisions, plaintiffs contended, covered them, making the officer and his surety liable to them for his improper conduct of the execution sale. The court rejected that argument on the ground that the provisions of the bond could not extend the bondsman's obligations beyond that of the officer's. It said: "The contract of suretyship measures the liability of the defendant, is worded according to the requirements of a sheriff's undertaking, and additionally is in the form required of a marshal of the city of New York. In the performance of his duties with reference to execution, levy and sale, his powers, duties and liabilities are the same as those of a sheriff. The undertaking was given to comply with the requirements of the statute and will be deemed not to create a more extensive liability upon the marshal than thereby imposed. McCluskey v. Cromwell, 11 N.Y. 593, 598. The statute aims to protect and the form of the bond provides indemnity to not only the city of New York but all parties whether suitors or not, who may complain, i. e., those who may suffer injury by the official default or misconduct of the officer in the execution of the powers and duties of his office. By its terms, construed in the light of the statute, the bond protects against malfeasance or nonfeasance of the officer as to the parties in behalf of whom or against whom he has process to execute * * * and against his malfeasance or misfeasance as to third parties with whose property or rights he unlawfully interferes. (People ex rel. Kellogg v. Schuyler, 4 N.Y. 173); in both cases only while acting within the scope of his official duties and performing ministerial functions or while performing judicial functions where he has maliciously deprived a person of his property or rights (57 C.J. p. 793)."

Solely on the basis of the last sentence above quoted from the Eckstein case, the following argument is erected: If for malicious irregular conduct by an officer performing a judicial function his sureties are liable, then surely, it is said, they would be liable for his malicious irregular acts when performing merely ministerial functions, as in the case at bar; wherefore, it is argued, in the case at bar the short statute of limitations applies even if the defendant officers acted in bad faith, i. e., the Eckstein case must be taken as overruling the earlier New York cases previously discussed. To this argument there are several answers:

(1) The sentence from the Eckstein case, on which the argument builds, is the most casual kind of dictum concerning a subject which was on the remote edge of the court's mind: the court having decided that, as the officer himself was not liable, his surety could not be, went on with a discursive discussion of a totally different kind of case, i. e., one where the officer is liable and the question arises as to the extent of his surety's liability. It has often been recognized that that type of dicta (or "asides") in such discursive judicial discussions are to be given little weight.[20a]

(2) The dictum in the Eckstein case cites merely, and in part virtually quotes from, 57 C.J. 793. There it is said that an officer is himself not liable "when acting in a judicial capacity" unless he acted "maliciously." This statement, in turn, is bottomed on the citation of but one American case,[20b] South v. Maryland, 1853, 18 How. 396, 403, 15 L. Ed. 433, a suit against a sheriff's sureties where they were exculpated because the sheriff himself was held not to be liable. There the plaintiff charged that he had been injured by the unlawful violence of a mob which the sheriff had failed to restrain. The court held that the sheriff owed no duty to the plaintiff, the sheriff's obligation to keep the peace being a general duty owed to the general public and not one the breach of which was actionable in a suit by a citizen who showed no special individual right of his own which was invaded.[20c] In a passing dictum, the court referred to Ashby v. White, 2 Lord Raym 938, 92 Eng.Rep. 126 (1703), and other early English cases (relating to interference with voting rights)

---

[20a] Cohens v. Virginia, 6 Wheat. 264, 399, 5 L.Ed. 257; Humphrey's Executor v. United States, 295 U.S. 602, 626, 627, 55 S.Ct. 869, 79 L.Ed. 1611; O'Donoghue v. United States, 289 U.S. 516, 550, 53 S.Ct. 740, 77 L.Ed. 1356; Weyerhaeuser v. Hoyt, 219 U.S. 380, 394, 31 S.Ct. 300, 55 L.Ed. 258; Taylor v. Voss, 271 U.S. 176, 185, 46 S.Ct. 461, 70 L.Ed. 889.

[20b] The only other case cited is an English case, Ashby v. White, 2 Lord Raym 938 (1703).

[20c] Cf. Massachusetts v. Mellon, 262 U. S. 447, 43 S.Ct. 597, 67 L.Ed. 1078; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S. Ct. 869, 84 L.Ed. 1108.

in which it was said that, for a non-ministerial act irregularly performed, a sheriff is not to be liable unless he acted "maliciously."

(3) That dictum in South v. Maryland as to judicial acts is not the rule now generally applied in the federal courts and in most American states: At one time, a distinction was made between irregular judicial acts of superior court judges and irregular acts of other officials acting judicially, the former being held not liable for irregular conduct, even if "malicious," while the latter were, if their conduct involved "malice"; that distinction has been generally abandoned, it being now the general rule that, whenever any officer is acting judicially, he is not liable for his conduct, although irregular and "malicious," if within his general jurisdiction. See Yaselli v. Goff, 2 Cir., 12 F.2d 396, 56 A.L.R. 1239, affirmed 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395, and cases there cited. Clearly, if the officer himself is not then liable, his sureties will not be.

(4) The dictum in the Eckstein case is thus based on a statement in 57 C.J. 793 which, in turn, is based on a dictum in a decision, as to judicial acts, which does not reflect the rule generally applied today.

(5) In the very dictum in the Eckstein case, the court cites the Schuyler case; and it will be recalled how, at a time when the New York courts still applied the same test in the surety cases and those cases relating to the short statute, the Schuyler case (1850), was interpreted in the Dennison case (1854), and that the Dennison case was cited with approval in a subsequent surety case, Cumming v. Brown (1871).

(6) The Eckstein case nowhere even mentions the cases relating to the short limitations statute; and, as already observed, there is reason to believe that, in New York, the surety cases are no longer pertinent in interpreting that statute.[20d]

(7) For all these reasons, we cannot agree that the dictum in the Eckstein case is to be taken as overruling the earlier New York cases construing the short statute in the manner heretofore described.

■ It is urged, however, that it is undesirable that the existence of the sheriff's privilege, to have a suit against him

barred after one year, should turn on the uncertain determination by a jury of the question, if put in issue by the plaintiff, of the sheriff's intent or purpose. If an answer to this argument were needed, we could find it in Mr. Justice Holmes' comment in Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 6, 49 L.Ed. 154: "It was urged farther that to make a right depend upon motives is to make it depend upon the whim of a jury and to deny the right. But it must be assumed that the constitutional tribunal does its duty, and finds facts only because they are proved." And there are numerous instances, in divers kinds of cases, where a cause of action exists only if a jury finds the presence of an improper purpose or intent. To question the wisdom of leaving such an issue to a jury is to raise the deeper question of the wisdom of the entire jury system. The jury, to those who regard it as an inadequate fact-finder, seems a dangerous instrumentality of government; to some extent it is so recognized in the way that our traditional rules of evidence have been adapted to it; but no one has ever suggested that most rules of so-called substantive law should be similarly adjusted to protect against the jury's inadequacies. And, no matter what judges may think of defects in the jury system, it is not for them either to revise it or to alter the corpus juris in cases where juries sit. What is more to the point, as we are in this case interpreting a legislative enactment, it is our duty to try to discover and carry out the legislative purpose, not to inject our own notions of desirable policy; and there is not the slightest indication that the New York legislature, when it originally passed the short statute in 1828,[21] or, since then, when amending its language, so distrusted juries that it wanted that statute construed so as to keep from them the issue of motive, purpose or intent, when it becomes pertinent. And, in construing a New York statute, we must follow the New York courts, whether or not we think their decisions wise or correct.

■ The trial judge, therefore, with reference to the defense of the statute of limitations, should have submitted to the jury, under appropriate instructions, the issue whether the defendants, although deviating from the commands of the warrant, intend-

---

[20d] As above suggested, the rule in New York as to sureties may have become broadened with the advent of commercial suretyship.

[21] In construing a statute, it is appropriate to recur to the history of the time when it was enacted. Great Northern Ry. Co. v. United States, February 2, 1942, 62 S.Ct. 529, 86 L.Ed. ——.

ed, in good faith, although mistakenly, to carry it out; he should have told the jury that they must bring in a verdict for the defendants unless the defendants lacked such an intention.

It is true that the defendants did not except to the judge's failure so to charge the jury. But they did plead the statute which, prima facie, was applicable. It was error to let the case go to the jury unless it was brought within the exception. If the evidence as to the defendants' intentions had been uncontroverted, the judge himself could have decided the issue (and, in fact, if he had failed to do so, we could now decide it); but, on the disputed evidence, the case should only have gone to the jury with instructions.

 It is also true that the trial judge instructed the jury: "If you find that these officers acted maliciously and out of hatred and detest of Mrs. Ingo, you can increase the damages that you would otherwise give if you found that they acted in good faith * * * But before you make any such findings, you should carefully consider whether or not any of these officers acted maliciously * * * They are entitled, even though they make mistakes, to exoneration from a charge of malice if they were honestly mistaken in what they did * * * If they acted maliciously, they must pay the ordinary damages plus what you think they should pay by reason of having acted maliciously." It is further true that, when the jury returned a $5,000 verdict, and the defendants argued that it was excessive, the judge said, "The verdict is for a larger amount than I anticipated it would be, but it was a very in-

telligent jury who sat and considered all the evidence." It might be urged that, as a consequence, the jury's verdict shows that they found "malice," which was more than enough to show absence of the intent upon which the privilege of successfully asserting the short statute is founded.[22] But that the jury granted a substantial verdict does not prove that they must have found the existence of such "malice," for there is no way for us to know whether the verdict was purely compensatory or, in part, attributable to defendants' bad motives.[23] We have no choice, therefore, but to reverse for a new trial.

The judgment is affirmed as to defendants Schmidt and Mathews. As to the other defendants, it is reversed and the case remanded for a new trial in accordance with this opinion.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

This is an action for false imprisonment brought against the sheriff and deputy sheriff of Westchester County, New York, and the warden and deputy warden of the county jail in which the plaintiff was confined, who were also deputy sheriffs. Emma H. Schmidt and Dr. Thomas Poultney Ellicott Mathews were also joined in the action as defendants and charged with participation in the tortious acts for which the other defendants were sued.

The plaintiff was indicted by the grand jury of Westchester County on January 28, 1936, for assault in the third degree. On the same day the district attorney issued a bench warrant directed to any peace

---

[22] The New York cases do not require that, to avoid the statute, the plaintiff must show hatred (or the like) directed against her; it is sufficient if she proves by a preponderance of the evidence that the defendants did not, in good faith, believe they were performing legitimate official functions. It may be added that less evidence than is contained in the record would have been sufficient to sustain a verdict on this issue.

[23] Since the case must be retried, it is appropriate to note the following:
(1) We see no reason to hold that the verdict was excessive, even if the jury had found no "malice."
(2) The trial judge did not err in refusing to charge the jury that the plaintiff's failure to obtain a writ of habeas corpus must be considered as mitigating the damages. The court said, in response to a question received from the

jury: "There is no doubt that she could have applied for a writ of habeas corpus, and upon doing so, the judge would undoubtedly have issued a writ. Whether the writ would have been contested and the extent of the contest and the litigation that might ensue, I can't say. No one else can say. However, if these people have done wrong in incarcerating her they cannot, in my opinion, place the burden upon the person wronged to go to the expense and difficulty, or go through the uncertainty of taking legal proceedings to escape from the consequences of the wrong that was inflicted upon her in the first instance. The duty of a defendant was not to commit a wrong at the beginning." This was in line with the New York authorities. See Den Norske Ameriekalinje Actiesselskabet v. Sun P. & P. Ass'n, 226 N.Y. 1, 8, 9, 122 N.E. 463.

officer of the State of New York which commanded him to arrest the plaintiff and bring her "before the Supreme Court to answer the indictment," or if the court had adjourned for the term to deliver her into the custody of the sheriff of Westchester County, or if she require it, that she be taken before any magistrate in that county that she may give bail to answer the indictment. The bench warrant was given to the sheriff's office for execution and on the next day deputy sheriff Koch went to Police Headquarters in Mount Vernon and had the defendant Emma H. Schmidt, a policewoman connected with the Police Department of the City of Mount Vernon, assigned to go with him. The deputy sheriff took the plaintiff directly to the Westchester County Jail, accompanied by Miss Schmidt, and there turned her over to the defendant Deputy Warden Bassett, who placed her in a cell. She started to make a disturbance at the jail and the defendant Dr. Mathews, who was an interne at Grasslands Hospital and at the time was making his rounds in the jail, was asked by Warden Toucher to examine her. He did so and issued a certificate that she was "suffering from a paranoid state and is in such a state of health that she requires immediate treatment and should be removed to a hospital for such treatment." This certificate was presented to County Judge Nolan who, on January 28, 1936, made an order that she be transferred to Grasslands Hospital. Section 508 of the Correction Law required that the certificate be signed by the jail physician and the warden, but it was only signed by Dr. Mathews as "Acting Jail Physician" who had been assigned to the jail clinic during the month of January, 1936, in the absence of the jail physician. The plaintiff was transferred to the hospital where she remained until February 26, 1936, when she was returned to the jail and bailed out.

The plaintiff does not contend that her original arrest was invalid but says that she should have been arraigned in accordance with the terms of the bench warrant before being brought to the jail and that therefore she should not have been confined in the jail or sent to the hospital. She also claims that all the defendants conspired to put her in jail and send her to the hospital for the purpose of thwarting her in the prosecution of an action she had brought against a man in Mount Vernon for seduction and breach of promise. The

jury found a verdict for the sum of $5000 in favor of the plaintiff against the sheriff, Casey; the deputy sheriff, Koch; the warden, Toucher, and the deputy warden, Bassett. It found a verdict in favor of Emma H. Schmidt, who had testified in substance that she only acted as a matron and did not cause plaintiff's arrest or confinement, and also in favor of Dr. Mathews, who testified that he knew nothing about the plaintiff until he was asked to examine her and said that he had treated her like any other person who was brought to the jail.

I concur in the majority opinion in so far as it affirms the dismissal of the complaint against the defendants Emma H. Schmidt and Dr. Mathews, but differ with its views as to the disposition of the judgment against the appellants Casey, Koch, Toucher and Bassett. In the case of these appellants I think not only that the judgment should be reversed, but the complaint dismissed. The cause of action against these four defendants was begun January 21, 1938, and for purposes of the statute of limitations each must be regarded as a sheriff of the State of New York. Cumming v. Brown, 43 N.Y. 514. The plaintiff was discharged from the hospital on February 26, 1936, and admitted to bail on the same date. Her alleged false imprisonment therefore ended more than one year before the present action was brought.

Section 51 of the New York Civil Practice Act reads as follows:

"§ 51. Actions to be commenced within one year. The following actions must be commenced within one year after the cause of action has accrued:

"1. An action against a sheriff * * * upon a liability incurred by him by doing an act in his official capacity or by omission of an official duty; except the non-payment of money collected upon an execution."

If the foregoing section applied to the case of the Sheriff of Westchester County and his three deputies, the action against them was barred by the New York statute of limitations. The question is whether they were acting in an "official capacity" when they did the acts for which they were held liable in the court below. I think that the acts of the sheriff and his deputies and any neglect of duty on their part were "official" within the interpretation given to Section 51(1) supra, by the New York Courts.

In Wiener v. Ellrodt, 268 N.Y. 646, 198 N. E. 537, affirming 243 App.Div. 820, 278 N.

Y.S. 458, a sheriff had falsely certified that he had served papers in an action by Wiener against one Ravekes and was sued for damages by Wiener because he had made a false return. Though the sheriff had given a false certificate, it was nevertheless held that when making it he was acting in an "official capacity" and that the one year statute of limitations created by Section 51(1) of the Civil Practice Act in respect to actions against a sheriff when acting in his official capacity, and not the general statute of limitations applicable to such actions, should govern.

In Politano v. Jacoby, 264 N.Y. 686, 191 N.E. 627, affirming 241 App.Div. 820, 270 N.Y.S. 988, an action against a sheriff for false imprisonment was held to be governed by the one year statute. He had arrested the plaintiff under an order committing the latter to jail for nine months, but held him for seventeen months and then transferred him to his successor. Nevertheless, the acts were determined to have been done in his "official capacity." See also In the Matter of Politano v. Fidelity & Deposit Co. of Maryland, 276 N.Y. 572, 12 N.E.2d 581, affirming 250 App.Div. 880, 297 N.Y.S. 159.

The decision in Pickle v. Page, 225 App. Div. 454, 233 N.Y.S. 461, affirmed in 252 N. Y. 474, 169 N.E. 650, 72 A.L.R. 842, and relied on by the plaintiff and the court below, seems to us distinguishable from Wiener v. Ellrodt and Politano v. Jacoby, supra. In Pickle v. Page, a sheriff aided a woman, who had been awarded custody of her child under a divorce decree of an Ohio court, to kidnap the child in New York. Prior to the date of the Ohio decree the child had been legally adopted in New York by its grandmother, the plaintiff, with the consent of its father, because of the abandonment by the mother. The mother had come to New York and sought a writ of habeas corpus for the purpose of reclaiming her child but had failed to sustain it. She then went to the plaintiff's house accompanied by the defendant, who was the Sheriff of Steuben County, New York, and ostensibly went along to keep the peace. He showed his badge, asserted his authority and assisted in the kidnapping. Thereafter the plaintiff sued the sheriff for aiding in the kidnapping. The court held that he was not acting in an official capacity and therefore the one year statute of limitations did not apply. His assistance in the kidnapping was without the least color of authority and was not rendered under the sanction of an order of any New York court. His acts were not those of a sheriff, but of a mere volunteer who was contributing to the tort of the child's mother. Moreover, the question whether he was acting in an official capacity was left to the jury at the defendant's request and for that reason the court held he was not in a "position to complain either that the trial court did not decide it as a question of law in his favor or that the jury, upon sufficient evidence, decided the matter adversely to him.".

In view of the fact that in the present case the cause of action is barred by the statute of limitations, it is unnecessary to consider whether the order for the transfer of the plaintiff to the hospital afforded the sheriff and his deputies protection against the plaintiff's claims or to discuss the other objections to the judgment against the defendants which are raised in their brief.

In answer to the conclusion that the one year statute of limitations is applicable, it has been suggested that the short statute for actions against sheriffs was enacted to protect their sureties by requiring actions to be brought speedily. While this may have been the immediate reason given, the statute does not even mention sureties and in terms directly covers actions "against a sheriff * * * upon a liability incurred by him by doing an act in his official capacity or by omission of an official duty; except the non-payment of money collected upon an execution."

But if the origin of the statute is important and liability of sureties throws light on the liability of the sheriff, to whom the short statute in terms directly applies, it seems clear that sureties would be liable for such wrongful acts on the part of the sheriff and his deputies as are charged in the present case.

The distinction is sought to be drawn between acts in excess of a sheriff's authority, which he purports to do as sheriff, and acts which are done both in excess of authority and maliciously, that is to say, for some consciously personal and unlawful end. I can see no justification for distinguishing between the latter class of acts and those dealt with by the New York Court of Appeals in Wiener v. Ellrodt, 268 N.Y. 646, 198 N.E. 537, and Politano v. Jacoby, 264 N. Y. 686, 191 N.E. 627, which are very recent decisions. Moreover, the language of the court in Eckstein v. Massachusetts Bonding & Ins. Co., 281 N.Y. 435, 24 N.E.2d 114,

116, 125 A.L.R. 1143, indicates that the distinction suggested is untenable. In that case the condition of the bond of a constable was to "well and faithfully perform and execute the duties of the office of constable, without fraud, deceit, or oppression." The court, referring to the form of the statutory bond, which is the form required of sheriffs under § 180 of the New York County Law, Consol.Laws. c. 11, remarked that: "By its terms, construed in the light of the statute, the bond protects against malfeasance or nonfeasance of the officer as to the parties in behalf of whom or against whom he has process to execute * * * and against his malfeasance or misfeasance as to third parties with whose property or rights he unlawfully interferes * * * in both cases only while acting within the scope of his official duties and performing ministerial functions or while performing judicial functions where he has maliciously deprived a person of his property or rights (57 C.J. 793)."

It may be argued that the above statement as to the bond extends the protection of the undertaking and the liability of the sureties to third persons only where the sheriff has been guilty of "malfeasance or misfeasance" in official duty while performing ministerial functions or has maliciously infringed upon the rights of third persons while performing judicial functions. But it surely cannot be supposed that a greater liability is imposed on sureties where the official acts maliciously in performing judicial functions than where he acts maliciously in performing ministerial functions, nor can I discover a basis for the application of such a rule in any of the decisions. Moreover, even if we should assume the existence of such a legal distinction, there is no basis for holding that the sheriff, his deputy or the wardens committed fraudulent acts in their individual interests. To hold that the sureties on the sheriff's bond would not be liable for imprisonment of the plaintiff because of the sheriff's malicious motives would involve a novel doctrine of suretyship not warranted by the New York authorities. The deputy sheriff lawfully took the plaintiff into custody under the bench warrant. While, in taking her to prison instead of before a magistrate, he exceeded his authority, very soon afterwards he placed her in the hospital pursuant to an order of the county judge. All these things were done "in his official capacity." They did not cease to be "official" because of any malicious motive and

the sureties would not be exempt from liability because such a motive existed. This, I think, is the New York law and is the law of nearly all other jurisdictions. Kosowsky v. Fidelity & Deposit Co. of Maryland, 1928, 245 Mich. 266, 222 N.W. 153; Stark Hickey, Inc., v. Standard Acc. Ins. Co., 291 Mich. 350, 289 N.W. 172; Clancy v. Kenworthy, 74 Iowa 740, 35 N.W. 427, 7 Am.St.Rep. 508; Powell v. Fidelity & Deposit Co. of Maryland, 1932, 45 Ga.App. 88, 163 S.E. 239; Indiana ex rel. Tyler v. Gobin, C.C., 94 F. 48; Greenberg v. People to Use of Balaban, 225 Ill. 174, 80 N.E. 100, 8 L.R.A.,N.S., 1223, 116 Am.St.Rep. 127; Commonwealth v. De Luca, 131 Pa.Super. 451, 200 A. 712; Branch v. Guinn, Tex. Civ.App., 242 S.W. 482. See also Wieters v. May, 71 S.C. 9, 50 S.E. 547; State v. Mankin, 68 W.Va. 772, 70 S.E. 764; Union Indemnity Co. v. Webster, 218 Ala. 468, 118 So. 794. The only decisions I find to the contrary are Towle v. Matheus, 130 Cal. 574, 62 P. 1064; State v. Wade, 87 Md. 529, 40 A. 104, 40 L.R.A. 628, and State v. Dayton, 101 Md. 598, 61 A. 624, where the liability of sureties was construed narrowly. The decisions in Cambridge v. Foster, 195 Mass. 411, 81 N.E. 278; De Sisto v. Stimmel, 58 App.Div. 486, 69 N.Y.S. 431, and Truog v. American Bonding Co., 56 Ariz. 269, 107 P.2d 203, were all cases where the official was not acting under any color of authority. It must be remembered that the question before us is not as to the liability of the sheriff and his deputies but as to whether their acts were performed in their "official capacity" so as to come within the short statute of limitations applicable to sheriffs.

A New York decision which is invoked against applying the short statute of limitations is the old case of Board of Supervisors of Kings County v. Walter, 4 Hun. N.Y., 87. There, a sheriff collected moneys from his county upon false vouchers which he made out for the board of fictitious prisoners. A majority of the court held that the short statute of limitations did not apply. But he had been collecting claims against the county based upon vouchers which not only were issued by him in excess of his authority, but also represented fictitious claims involving no actual transactions on his part, either individually or as sheriff. Another New York decision which is relied on in the majority opinion is Dennison v. Plumb, 18 Barb., N.Y., 89. There a sheriff who had sold the property of B on an execution issued against the

property of A was held to have acted "in his official capacity" and to have accordingly had the right to invoke the short statute of limitations applicable to sheriffs. The statement in the opinion that the short statute applied "in the absence of any evidence to show that the deputy * * * acted in bad faith, knowing or believing that he had no right to seize the property upon the execution * * *" was clearly a dictum. I can see nothing in the general language of Dennison v. Plumb to justify departing from what seems to me the fair implication of Wiener v. Ellrodt, Politano v. Jacoby and Eckstein v. Massachusetts Bonding & Ins. Co., supra.

The judgment is affirmed as to the defendants Schmidt and Mathews. I think that it should be reversed as to the defendants Koch, Casey, Toucher and Bassett, with directions to dismiss the complaint against them on the ground that the action was barred by the statute of limitations. It seems to me that this, rather than a new trial, ought to be the disposition of the case (a) because their acts were done in an "official capacity" and malice, if it existed, did not toll the statute; (b) there was no substantial proof of malice.