W. F. Allen, J.
 

 The contractor Cromwell was not prohibited by any law from sub-letting the work of constructing the locks agreed to be built by him. But for the provisions, of his contract with the canal commissioners he would have been at liberty to perform his undertaking with the state by sub-contractors or by any other instrumentality that he had pleased to employ.
 

 The provision against subletting was inserted by the canal commissioner in his contract,- for the reason that it was supposed calculated to promote the interests of the state, and secure the faithful performance of the work, and not with a view to benefit the laborers or material men employed upon it. It was an agree1ment by the contractor with the state, and not with those who should labor in building the locks; neither was it made really or nominally for the benefit of the latter. As the canal commis
 
 *589
 
 sioners were not required by any law or by any duty to the laborers to require the insertion of this provision in the contract, so the agents of the state after the execution of the agreement, and at any time during its performance, without consulting those employed upon the work, or doing them any injustice, could have consented to erase it or expressly waived a compliance with its terms, or acquiesced in a sub-letting- in violation of it. By the terms of it, the contractor incurred a duty to the state, but not to the laborers, who in turn acquired no rights under it. What would have been the rights or the proper proceedings on the part of the state upon the breach of the obligation not to sublet, whether they could have annulled the contract or sustained an action, it is not necessary to inquire ; it is enough that no rights or remedies would have accrued to the laborers.
 
 (Winterbottom
 
 v.
 
 Wright,
 
 10
 
 M. & W.
 
 109 ;
 
 Thomas
 
 v. Winchester, 2
 
 Seld.
 
 408;
 
 Tollit
 
 v. Sherstone, 5
 
 M. & W.
 
 283.) The contract of the canal commissioners with Cromwell was designed to prescribe and regulate the reciprocal rights and duties of the contracting parties as between themselves, and every covenant and agreement on the part of Cromwell was for the benefit and to protect the interests of the state, while the bond in suit was for the benefit of the laborers, and in it the state as such had no interest. The two contracts had each its separate and distinct functions to perform; in each the contracting parties were different and there was no connection between them, except that the bond in suit grew out of the fact that Cromwell, one of the defendants, had become a contractor upon the public works of the state but the terms of his contract did not enter into or regulate the terms and conditions of the bond, which were fixed and regulated by statute. The terms of the contract of Cromwell throw no light upon and afford no aid in the construction of the defendant’s engagement.
 

 The condition of the bond is in .substantial conformity with the statute under which it was taken,
 
 (Laws of
 
 1850,
 
 ch.
 
 278,) and is to the effect that the said Cromwell
 
 “
 
 shall and do well and truly pay or cause to be paid in full the wages stipulated and agreed to be paid to each and every laborer em
 
 *590
 
 ployed by Mm or Ms agent or agents, in the construction of the work specified in a certain contract for the construction of locks Nos. 108 and 109, Black River Canal, made &c., as often as once' in each month, pursuant to the provisions of an act of the legislature of this state, passed April 10, 1850, entitled £ An act to secure the payment of wages to laborers employed on the canals and other public works of this state.’ The statute provides that public officers letting any' contract for work for the state, shall require and take, in addition to the bond now required by law for the security of the state, a bond with good and sufficient sureties, not less than two, conditioned that such contractor shall well and truly pay in full, at least once in each month, all laborers employed by him on the work specified in such contract,” &c.
 

 The liability of the defendants depends upon the true construction of their contract, read in the light of the statute in pursuance of. which it was made. Whatever may be the liability of Cromwell, the principal, either to the state or to the laborers employed in the construction of the work done, is the liability of Utley, the surety; and consequently the joint liability of both defendants upon their bond cannot be extended beyond the fair -import of the - undertaking.. The principle is well settled, that a surety is not held beyond the fair scope of his engagement, and that in contracts of suretyship, above all other contracts, the meaning of words and phrases is not to be extended to the prejudice of the surety, but that words shall be taken to have been used in their ordinary popular sense. In other words, the liability of sureties is always
 
 strictissimi juris,
 
 and shall not be extended by construction. (
 
 Walsh
 
 v.
 
 Bailie,
 
 10
 
 John.
 
 181;
 
 U. States
 
 v.
 
 Jones,
 
 8
 
 Peters,
 
 899;
 
 Same
 
 v.
 
 Boyd & al.
 
 15
 
 id.
 
 187;
 
 Miller
 
 v.
 
 Stewart,
 
 9
 
 Wheat.
 
 702, 703.) The bond provides for the payment of the wages stipulated and agreed to be paid to the laborers employed by Cromwell or his agent or agents', and that upon the failure of Cromwell “ to pay to each and every of the laborers so as aforesaid employed by Mm, as is herein provided, then each and every of said laborers to whom the aforesaid Cromwell shall then be indebted, may
 
 *591
 
 bring an action on this instrument in his or her own name, pursuant to the provisions of the act aforesaid, for the recovery of the amount of such indebtedness.” The referee has found that the plaintiff and the other laborers to whose claims the plaintiff has succeeded by assignment, were employed by Shippey, and consequently that they were not employed by Cromwell. Unless therefore the word “ employment” means one thing in the judgment of the referee, and another in the undertaking of the parties, the laborers were not employed by Cromwell within the intent of the bond. It is not the labor performed upon the work alone, which gives the, laborer rights under the bond, but it is labor done in pursuance of an employment'by Cromwell. To employ, is
 
 “ to
 
 engage in one’s service; to use as an agent or substitute in transacting business; to commission and intrust with the management of one’s affairsand when used in respect to a servant or hired laborer, is equivalent to hiring, which implies a request and a contract for a compensation, and has but this one meaning when used in the ordinary affairs and business of life. By laborers employed by Cromwell, mentioned in the condition of the bond, are intended those hired by him, working at his request, and under an agreement on his part to compensate them for their services; and employment by Shippey, as found by the referee, in this sense excludes the idea of employment by Cromwell. • The plaintiff and his co-laborers were confessedly the servants and agents of Shippey, and could not at the same time and in the same sense be the servants and agents of Cromwell. Shippey was indebted to them upon his contract of hiring, and there being nothing in this case to take it out of the ordinary rule, it follows that Cromwell was not indebted to them upon the same contract. It is not claimed that ordinarily these men could be said in legal or popular parlance to have been einployed by Cromwell; and if not, then as against the surety a different effect should not be given to the transaction or to the words used. We are not at liberty, in order to extend the liability of the parties to the bond, one of whom is a surety, to strike out of the condition the words “ by him .or his agent or agents,” so
 
 *592
 
 that it shall provide in terms for the payment of
 
 ft
 
 each and every laborer employed in the construction of the work,” without reference to the employer. The contract thus modified would be entirely different from that actually made by the parties.
 

 The liability of the defendants is made to rest, in the judgment of the referee and of the court below, in part upon a quasi agency of Shippey for Cromwell in the employment of the laborers and construction of the work, and the relation of principal and agent between them is supposed to grow out of the peculiar circumstances and equities of the case. We have seen that no rights result to the laborers from the agreement not to sublet. It was neither criminal, immoral or illegal to perform the work by sub-contractors. It was merely a violation of contract for which the adverse contracting party had a remedy by action or otherwise. It is not necessary to ignore the under-letting and call it an agency, to avoid the presumption or appearance of illegality or criminality. Third persons had no interest in the covenant against underletting, and the relations of the parties were not changed by reason of it, neither did any equities accrue to third persons in consequence of it. The contractor could not have saved himself from the consequences, whatever they were, of subletting, by calling it an “ agency.” The distinction between a subcontractor and agent is well marked and defined, and the rights and liabilities growing out of the different relations of principal and agent, and contractor and sub-contractor, are equally well understood, and cannot be supposed to have been confounded by the parties to this bond. The distinction is recognized in
 
 Blake
 
 v.
 
 Ferris,
 
 (1
 
 Feld.
 
 48,) and in
 
 Poole
 
 v.
 
 Palmer,
 
 (9
 
 M. & W.
 
 71.) Whenever the relation of master and servant ceases to exist, the liability by virtue of, or growing out of the relation, ceases. The relation of sub-contractor and agent being entirely distinct and incompatible, and the referee having found that in fact Shippey was sub-contractor, and as such employed the laborers, we could not rightfully adjudge that he was the agent of Cromwell, either in contemplation of
 
 *593
 
 -law or of the parties to the contract. Again, the condition of the bond is for the payment of an indebtedness of Cromwell, and such indebtedness cannot be predicated upon an employment by Shippey of servants and laborers to perform for him the work he had undertaken to do for Cromwell, for the compensation and upon the terms agreed upon. Aside from the statute and the bond, it is clear an action would not lie against Cromwell upon any legal liability, or any agreement, express or implied; to pay the laborers employed by Shippey; and if not, then there was no indebtedness by which the obligors became liable by their bond. Their liability is based upon a subsisting legal indebtedness of Cromwell the principal.
 

 But laying out of view the fact that this obligation should be construed as a surety contract, and giving the statute and the bond that reasonable and fair interpretation which their language demand, I can see no ground for asserting the liability of the defendants. We are urged to give these instruments an equitable construction, in view of the supposed equities represented by the plaintiff, and a liberal construction so as effectually to meet the beneficial end which the legislature had in view in the enactment, and prevent a failure of the contemplated remedy. It is beyond question the duty of courts in construing statutes, to give effect to the intent of the law-making power, and se.ek for that intent in every legitimate way. But in the construction, both of statutes and contracts, the intent of the framers and parties is to be sought first of all, in the words and language employed, and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of ■ the framers of the instrument, there is no occasion' to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and. forced construction for the purpose of
 
 *594
 
 either limiting or extending their operation. Courts cannot correct supposed errors, omissions or defects in legislation, or vary by construction, the contracts of parties. The office of interpretation is to bring sense out of the words used, and not bring a sense into them.
 
 (Lieber’s Polit. and Le. Hermeneutics,
 
 87;
 
 2 Ruth. Inst. ch.
 
 7, & 2 ;
 
 Story’s Com. on Const.
 
 § 392;
 
 Purdy
 
 v.
 
 The
 
 People, 4
 
 Hill,
 
 384;
 
 Smith’s Statutes, &c.
 
 § 478 ;
 
 Waller
 
 v.
 
 Harris,
 
 20
 
 Wend.
 
 561.) The rule is well expressed by Judge Johnson, in
 
 Newell
 
 v.
 
 The People,
 
 (3
 
 Selden,
 
 97,) in these words, “ Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing we are to seek is, the thought which it expresses. To ascertain this, the first resort in all cases, is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case, there is no room for construction. That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have the right to add to, or take away from that meaning.”
 

 In the statute and bond under consideration, we have a clear and precise provision for an indebtedness of Cromwell to laborers employed by him, in the natural reading of the words in their ordinary and most obvious sense, not needing and not admitting of any interpretation. To this extent they interpret themselves. This one class of cases is provided for, and it is now sought to embrace another and distinct class of cases, another set of laborers, upon the doctrine of equitable construction. If the statute and undertaking could have no effect except by resort to this liberal construction and extended application of thése terms,' there would be more reason to resort to conjecture to ascertain the meaning of the framers of the instruments. But full effect can
 
 *595
 
 be given to the instruments without the unnatural and forced construction sought to be engrafted upon them, and therefore one
 
 true sense
 
 being given to the words, and that being the apparent and obvious sense, within well settled rules of legal hermeneutics, we cannot properly seek for another sense.
 
 (Lieber, ut supra,
 
 86.) As we have seen, the natural and obvious meaning of the statute and obligation is to secure the payment of the indebtedness of Cromwell to laborers employed by him; and the claim sought to be brought by construction within the benefit of the statute and of the agreement, is an indebtedness of Shippey to laborers employed by him, an entirely different matter. Perhaps had the case of sub-letting occurred to the legislature, they would have also provided for it, and perhaps had Utley been requested to become security for Shippey’s debts, he would have done so; but neither has been done, and the courts can neither usurp the functions of the legislature, by doing or assuming as done what they may think should have been done in the way of legislation, or take the place of contracting parties, and vary the terms of their agreements to meet any supposed equities. The cases of
 
 King
 
 v.
 
 Bird,
 
 (2
 
 B. & Ald.
 
 52,)
 
 Donaldson
 
 v.
 
 Wood,
 
 (22
 
 Wend.
 
 395,) decided in the court for the correction of errors, and
 
 Millered
 
 v.
 
 The Lake Ontario, Auburn and New- York Railroad Co.,
 
 (9
 
 How. Pr. R.
 
 238,) are all analogous in principle, and decided upon the rules of legal interpretation which we have sought to apply to this case; and if the principles upon which these cases were, decided are sound, as we believe them to be, they, with the reasoning of the chancellor in 22 Wendell, and of Judge Selden in 9 Howard, apply with full force to the case before us, and are conclusive against the right of the plaintiff to recover.
 

 The judgment of the supreme court must be reversed and a new trial granted, costs to abide the event.
 

 Gtardiner, C. J., Johnson, Parker and Selden, Js., concurred in the foregoing opinion. Denio, J., having been counsel in the cause, took no part in the decision.