(14 App. Div. 586.)

### DAVENPORT v. MORRISSEY et al.

(Supreme Court, Appellate Division, Second Department. March 2, 1897.)

PARTNERSHIP — DISSOLUTION BY DEATH—DIVISION OF PROFITS.

     A contract of partnership provided for an equal contribution of stock and division of profits and losses; that an inventory, accounting, and settlement should be made at the beginning of each year; that one partner should give his time to the business, and the other should have the right to dissolve the partnership on 30 days' notice, paying for his partner's interest the value thereof as shown by the last annual inventory; and that, "in case of the

death of either partner, his interest in the firm shall be deemed to be of the value shown by the last previous inventory." The partner giving his time to the business died just before the end of the year, having drawn $8,399.89 out of $34,440.20 profits of the business since the last preceding inventory. *Held*, that the deceased partner's administrator was entitled to recover from the survivor one-half of the partnership property as shown by the last annual inventory, and one-half of the accrued profits, less the amount drawn out.

Appeal from judgment on report of referee.

Claim by William B. Davenport, public administrator, as administrator of the estate of Michael J. Garry, against Thomas Morrissey, John Mullin, Michael E. Bannin, and Della Garry, as executors of the will of Thomas Garry. By stipulation the matter was referred, and a sole referee appointed under the statute. There was a judgment in favor of defendants, and plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Charles H. Otis, for appellant.

Samuel Untermyer, for respondents.

CULLEN, J. The plaintiff represents the estate of Michael J. Garry, deceased; the defendants that of Thomas Garry, deceased. On May 1, 1889, Thomas and Michael J. Garry entered into the following agreement of co-partnership:

"Articles of co-partnership made and entered into at the city of New York on the first day of May, eignteen hundred and eighty-nine, between Thomas Garry, of the city of New York, party of the first part, and Michael J. Garry, of the city of Brooklyn, party of the second part, witnesseth: That the said parties have entered into, and by these presents do enter into, a co-partnership under the name and style of Garry Brothers, for the purpose of prosecuting the business of wholesale and retail dealing in dry goods in the city of New York; the said co-partnership to begin on the day of the date thereof, and to continue until dissolved by mutual consent, or by death of one of the partners, or in the manner hereinafter stated. Each partner contributes to the firm assets the sum of fifty thousand dollars ($50,000) in goods, wares, and merchandise. The profits and losses of the business are to be divided and shared equally between the partners. The said Michael J. Garry is to give his entire time and attention to the prosecution of the business, and the said Thomas Garry is to give such portion of his time to the business as he may feel disposed to devote to the same. An inventory of the property of the firm is to be made in the month of January of each year, and a balance struck, and the profits or losses ascertained, and division made on the first day of February in each year. In case of the death of either partner, his interest in the firm shall be deemed to be of the value shown by the last previous inventory taken before his death, and that sum shall be payable by the surviving partner to the executor or administrator of the deceased partner in eight (8) equal annual payments, to be made on the first day of February in each year thereafter, with interest thereon from the date of the death of the decedent, provided that the surviving partner may, if he chooses so to do, pay the same sooner than is so provided. The payment of such amount shall be secured by the surviving partner by bond or other security satisfactory to the executor or administrator of the deceased partner, and, in default of such security being given, the entire interest of the deceased partner in the firm shall be forthwith payable on demand. Said Thomas Garry may dissolve said co-partnership at any time by giving thirty (30) days' notice to the other partner. In case he shall make such dissolution, he shall take all the property of the firm, and pay to Michael J. Garry in cash one-half of the value of the firm assets, as shown by the last annual inventory taken by the firm previous to such dissolution. In witness whereof the parties to these presents have hereunto set their hands and seal the day and year first above written."

Michael J. Garry died November 23, 1890, leaving two minor children. No letters of administration were taken out on his estate until those granted to the plaintiff, but the brother, Thomas Garry, continued the business till his own death. On the 25th of January, 1890, upon the settlement of the business of the preceding year, the amount to the credit of Michael J. Garry on the firm books of account was $59,702.12. Between that date and the time of his death Michael J. Garry drew from the firm $8,399.89. It was conceded on the trial that one-half of the net profits of the firm between January 25, 1890, and November 23 of the same year, the time of the death of Michael J. Garry, amounted to the sum of $17,220.10. The controversy in the case is as to the extent of the obligation of Thomas Garry, under the partnership articles, to make payments to the estate of his deceased partner. The defendants claimed that under the partnership articles the estate of Michael J. Garry was not entitled to any share of the profits earned after the inventory and settlement of the accounts in January, 1890, and also that, as against the amount standing to his credit on that date, there was to be charged to his estate the amounts he drew from the firm up to the time of his death. The referee decided both questions in the defendants' favor, and from the judgment entered on the decision of the referee plaintiff has appealed.

The rules for the construction of contracts have often been stated. They are to be read according to the natural and obvious import of the language, without resorting to subtle and forced construction. Courts cannot correct suspected errors, omissions, or defects, or by construction vary the contracts of parties. If the words employed convey a definite meaning, and there is no contradiction or ambiguity in the different parts of the same instrument, then the apparent meaning of the instrument must be regarded as the one intended. In construing a written instrument it may be read in the light of surrounding circumstances in order to more perfectly understand the intention of the parties, and when it is thus discovered it should control. McCluskey v. Cromwell, 11 N. Y. 593; Schoonmaker v. Hoyt, 148 N. Y. 425, 42 N. E. 1059. At the same time, the whole of the instrument is to be considered in determining its proper interpretation, and a reasonable construction should be given it, if the language permits. Even as to a statute it has been held: "It necessarily follows that when a statute leads to an absurdity, or to a contradiction between its different parts, its general language may be interpreted to conform to the presumed intention of its framer." Per Ruger, C. J., People v. Davenport, 91 N. Y. 585.

The claim of the defendants is that the contract fixes the exact amount to be paid by the surviving partner on the decease of his co-partner, to wit, the value of the interest of that partner shown by the last previous inventory taken before his death; and that hence that amount cannot be varied or increased by the profits that accrued between the time of the inventory and that of the death of the partner. They assert that if, subsequent to the inventory, the business had been unprofitable, the surviving partner would

have been compelled to pay the same sum not diminished by any losses. It is claimed that such a construction of the agreement is perfectly fair, as either partner might die first, and the survivor would take the risk of losses, as well as gains, occurring subsequent to the inventory. In this sense of fairness it would be difficult to imagine a fairer proposition than that if A. should cut a red card he should pay B. five dollars, while if he should cut a black one B. should pay him five dollars. But these two parties were entering into a co-partnership for business purposes. They doubtless intended to provide for the contingency of the death of either of them, not necessarily to gamble on that contingency. Between the time of an inventory and the death of either partner the firm might become insolvent, though not actually fail, so as to dissolve the partnership. I can hardly believe that in such case it was contemplated that the survivor should pay to the estate of the deceased partner the value of the latter's interest at the last inventory. In fact neither the learned counsel for the respondents nor the referee carry the claim that the interest of the partner at the last inventory conclusively fixes the amount of the liability to its logical conclusion. The interest of the partners, as shown by the inventory, could be varied in but four ways: First, by subsequent profits; second, by subsequent losses; third, by drafts of the partner on the firm; fourth, by deposits of the partner with the firm, or payments on its account. As to the last, there is no evidence that either partner made any deposit with the firm, other than his original contribution of capital. The defendants insist that the inventoried interest cannot be modified in either the first or second manner, but they equally insist that it is to be modified in the third way. If we are to be confined in interpreting this contract to the exact language of this provision alone, and are merely to say ita pactum scriptum, regardless whether the interpretation leads to reasonable results, I cannot see how the inventoried interest is to be varied by the subsequent drafts of a partner. To this the defendants' counsel says, in his brief:

"The estate of Michael J. Garry was properly chargeable with the moneys drawn by him during his life. This is so clear that the mere statement of the proposition is sufficient to overthrow any claim to the contrary; * * * otherwise Michael J. Garry might have withdrawn his entire capital on the theory that such withdrawal was a compensation to him for his possible death within the year."

I think the counsel is right. "The mere statement of the proposition is sufficient to overthrow any claim to the contrary." But he has proved too much. The instance that he suggests is the reductio ad absurdum of the proposition that the inventoried value of the deceased partner's interest was to absolutely fix the amount to be paid by the surviving partner, regardless of the subsequent hazards of the business, or the subsequent acts of the partners. There is this difference, and this difference only, between the case of profit or loss to the business and the drafts of the partner: that in the latter case the amount of his interest is affected by the voluntary acts of the partner, while as to profits or loss of the business it

would undoubtedly be the effort of each partner to do the best he could for the firm. It is suggested that Michael did not have the right to make these drafts in "anticipation of profits." These drafts were not necessarily made in anticipation of profits. Some $9,000 over his contribution of capital to the firm stood to Michael's credit. He was under no obligation to leave this sum there, and had the right to draw it at any time. So the right to charge these drafts cannot stand on this ground, but we are remitted to the substantial argument that it is absurd that Michael should be repaid for moneys which he had drawn out.

The learned referee was of opinion that the clause of the agreement which gave Thomas Garry the right to dissolve the co-partnership, and take the property of the firm, tended to confirm the construction he gave to the provision of the agreement here in controversy. He thought this provision was more arbitrary, and could have worked more injustice to Michael J. Garry, than the one we have been considering, for he says Thomas Garry could have given the notice required by the agreement 11 months after the inventory, and thus deprived Michael of his profits during that period. I am frank to say that I do not appreciate the force of this argument, or that the provision empowering Thomas Garry to dissolve the partnership at his will throws much light upon the construction of the previous provision as to the case of the death of either partner. It is of this moment only: it shows that the agreement was not carefully or accurately drawn, and that it does not always express with precision the actual intent of the parties. In this latter provision Thomas Garry, upon dissolution, was to pay, not the value of Michael's interest as shown by the last inventory, but "one-half of the value of the firm assets, as shown by the last annual inventory." Was he to pay one-half of the value of the assets of the firm, regardless of its liabilities? Even if the term "assets" be construed as net assets, was he then to pay one-half of their value, regardless of how the interests of the partners stood, under the last inventory? It appears that at the inventory of January 25, 1890, Michael's interest was $59,720.12. It does not appear what the interest of Thomas was at that time. If Thomas had only his capital then in the firm, was he to get one-half of Michael's surplus of $9,720.12? Or if the interest of Thomas, as shown by the inventory, was much larger than that of Michael, was Thomas, as a condition of dissolving the firm, to pay to Michael one-half of that excess? It will thus be seen that a too literal reading of this agreement will ascribe intentions to these parties which, I am sure, they never had. The question is not like that of construing a hard agreement charitably, for we know that such agreements are made, and purposely so made. Here the question is of construing an agreement reasonably, seeking to obtain the real intent of the parties, and I think that we should not give it an interpretation leading to such unreasonable results, unless no other interpretation is possible. I think the instrument, taken as a whole, admits of a reasonable construction. The dominant provisions were: First,

while the agreement was in force, profits and losses should be shared equally; second, that in the case of the death of either partner the survivor should take the property and business, making compensation to the estate of the deceased; third, Thomas Garry should have the option at any time of acquiring the business and property of the firm on making similar compensation to Michael.   In determining the amount of that compensation, the interest of either partner was to be taken as his interest at the time of the inventory; that is to say, that the inventory, or rather the statement of accounts on the firm books (for here again language is used inaccurately, as the inventory would not show the statement of the partners' accounts), would establish conclusively the interest of the parties, and not be subject to be opened or impeached.   But the provision that the profits and losses should be shared equally was still to be operative, and each party entitled to his share of the profits, or obliged to bear his share of the losses, and pay any drafts he might make upon the firm.   This construction of the agreement is certainly the most reasonable one suggested, and, we think, is in harmony with the intent of the parties as expressed in the whole instrument, though it may vary from particular expressions carelessly or inaccurately used.

The judgment appealed from should be reversed, and a new trial granted before a new referee, to be appointed at special term; costs to abide the event.

BARTLETT, HATCH, and BRADLEY, JJ., concur.

GOODRICH, P. J.   I fully agree with the opinion of Mr. Justice CULLEN, but desire to make a suggestion which, by reasoning from another standpoint, only adds force to his opinion.   If we were able to have before us the evidence of the two partners as to their intention in making the contract of partnership, and the reason for introducing into it inconsistent and apparently unreasonable paragraphs, it might throw light upon the proper construction to be given to the whole instrument.   In the absence of such ability, it is well to ask what construction, if any, has been put upon it by their own acts.   Bearing in mind that the partnership term was of indefinite duration, terminable only by the death of either party, or by Thomas on a 30-days notice of his intention to do so, there is no evidence of any change from the time of making the inventory till the time of Michael's death in the method of transacting the business, from that which had prevailed since the formation of the partnership in 1889.   Michael was still obliged, by the unchanged contract, to give his entire time and attention to the promotion of the business; and, for all that appears to the contrary, he did so. Thomas was still obliged to give such a portion of his time as he might feel disposed to give thereto; and we may assume that he did that, and nothing more.   In other words, I think that we may assume that these provisions of the contract were carried out.   Then Michael managed the entire business, had control of its prosecution,

was at work daily, and was engaged in no other occupation. He drew money in about equal monthly aggregates, apparently, almost exactly parallel with his share of the profits; and there is no evidence to show that he had ever done otherwise, or that there was any change in any of these respects. Checks were drawn on the firm's bank account, even after the date of his death, and charged to his account on the books. In short, the parties intended no changed relations and made none. Can it be said that Michael shall receive nothing for his attention, care, and management of the business, when no action was taken by Thomas to dissolve the partnership, which he had the exclusive right to do; that Thomas can be allowed to stand by for nearly a year, and await results, to speculate as to the possible duration of the partnership, to take the chances of insolvency, and then claim to exercise his option of dissolution, and relegate his brother to the year-old inventory, and compel the payment of the amount of that inventory, "come weal, come woe"; and this, although Michael continued to be liable as a partner for all the transactions of the firm during the intervening period? Yet this is the logical deduction from the insistence of the respondents that they shall be permitted to stand on the clear terms of the writing. Such a contention is offensive to justice, and a court will look beyond the face of the contract in order to ascertain the intention of the parties and the meaning of language which, if construed literally, would permit a surviving partner to work injustice to the estate of his dead brother. Nor was there any such intention shown by Thomas. On the contrary, he did not construe the contract literally, as the counsel for the respondents would have us do. He made entries in the books after his brother's death, and in one sense these entries show that he construed the contract as meaning that the inventory defined the amount to be paid to his brother's estate; yet, in another sense, his action in allowing interest on the amount shows that, in spite of the language of the contract, he knew it to be just between partners, and within the real spirit of a partnership contract between brothers, that there should be compensation made for his brother's work, either in profit sharing or in interest. He chose, indeed, the smaller obligation of interest; but the fact of his allowance of anything shows that the contract, literally read, was not such as he understood or intended it to be. The counsel for the respondents claims that the contract was equally good for both partners, and that "it was in no sense unilateral." We cannot agree with him. The power to dissolve the partnership was exclusive in Thomas until Michael's death put an end to his right. This provision made a very unequal balance of the partners' rights, and I cannot agree with the view of respondents' counsel, respecting the equal powers of the partners, for the reasons already stated.