ROBERT P. BENNETT, as President of the Uniformed Court Officers Benevolent Association of Nassau County, et al., Respondents, v COUNTY OF NASSAU, Appellant.

Second Department, December 29, 1978

**APPEARANCES OF COUNSEL**

*Edward G. McCabe, County Attorney (Matthew A. Tedone* of counsel), for appellant.

*Donovan & Donovan (Francis J. Donovan* of counsel), for respondents.

*Michael R. Juviler (Michael Colodner* and *John Poklemba* of counsel), for Richard J. Bartlett, Chief Administrative Judge, *amicus curiae.*

**OPINION OF THE COURT**

Shapiro, J.

In this action, plaintiff Bennett, as president of the Uniformed Court Officers Benevolent Association of Nassau County, sought a judgment declaring "that the non-judicial employees of the Unified Court System who ceased to be employed by Nassau County and became employees of the State of New York effective April 1, 1977 * * * incurred a 'termination of service'" within the definitions of certain county ordinances (and pursuant to the parallel contracts between Nassau County and the Nassau Chapter of the Civil Service Employees Association [the CSEA]) and that they became entitled to cash payment for certain terminal leave benefits on April 1, 1977. Pursuant to the same contention, the individual plaintiffs, who were nonjudicial employees in the courts of Nassau County, claim the sums of $4,255.08, $5,917.27 and $5,522.86, respectively, for accumulated vacation and sick leave. They assert that said sums are due to them notwithstanding the fact that they are continuing to perform the same services in the same courts as they did prior to the effective date of court unification. Special Term agreed with them. We do not.

An understanding of the issues requires an analysis of certain county ordinances and the parallel collective bargaining agreements between Nassau County and the CSEA, as well as the relevant provisions of the court unification statute (see Judiciary Law, § 39 [this provision was originally enacted as section 220 of the Judiciary Law and was so numbered when the action was before Special Term; the section was renumbered by chapter 156 of the Laws of 1978; the provisions will be referred to herein as section 220]).

I

THE COUNTY ORDINANCES AND THE COLLECTIVE BARGAINING AGREEMENTS

*The 1963 Ordinance*

County Ordinance No. 51-1963, dated March 4, 1963 (1963

Proceedings of Board of Supervisors of County of Nassau, 437-444), *inter alia*, deals with vacations and sick leaves for officers and employees of Nassau County. *Neither it nor its successor ordinances (nor the parallel CSEA agreements) were limited to court employees.*

Subdivision (d) of section 3 thereof permitted accumulation of unused vacation time up to a maximum of 30 days. Subdivision (e) of section 3 stated that "[u]pon the termination of service for any reason, other than cause, or upon the death in service of any officer or employee covered hereby, such officer or employee, or his legal representative, shall be entitled to cash payment of the monetary value of his or her accumulated and unused vacation." Section 4 detailed how "sick leave" was to be computed, but it made no provision for ultimate cash payment of unused sick leave. This ordinance had no section devoted to "definitions" and, specifically, "termination of service" was not defined.

*The 1969 Ordinance and Collective Bargaining Agreement*

County Ordinance No. 34-1969, dated February 17, 1969 (1969 Proceedings of Board of Supervisors of County of Nassau, 373-381), covered the same subject matter of vacations and sick leave for the county's officers and employees. It was based on a collective bargaining agreement between the County of Nassau and the CSEA, signed the same day and covered the calendar year 1969. The ordinance stated that Ordinance No. 51-1963 was repealed. However, in section 3, entitled "Vacations", it provided that "[u]nless discharged for cause, an officer or employee or his legal representative shall receive, upon the termination of service * * * a cash payment for the monetary value of his accumulated vacation time". It increased the "maximum vacation time which may be accumulated" to 40 days. Similar to the 1963 ordinance, section 4 stated how sick leave was to be computed and did not provide for ultimate cash payment for unused sick leave. The 1969 ordinance contained a separate section (§ 2) devoted to "Definitions". The tautology in this section is evident:

"Section 2. Definitions

"1. The term 'day' is a working day.

"2. A 'part-time employee' is one who holds a position which has been classified as part-time by the Nassau County Civil Service Commission.

"3. A 'seasonal employee' is one who holds a position which has been classified as seasonal by the Nassau County Civil Service Commission.

"4. A 'temporary employee' is one who holds a position which has been classified as temporary by the Nassau County Civil Service Commission.

"5. 'Termination of service' means separation from the service of the County.

"6. 'Years of actual completed service' means full-time service from the date of employment with the County to the date of termination of service; provided, however, that such service interrupted for a period of one year or less shall not be deemed to be terminated but such interruption shall not be credited as actual service of the County."

*The 1973 Ordinance and Collective Bargaining Agreement*

County Ordinance No. 194-1973, dated June 25, 1973 (1973 Proceedings of Board of Supervisors of County of Nassau, 1671-1675), covered the same subject matters. It amended (not repealed) Ordinance No. 34-1969. It, too, was based on a collective bargaining agreement between the county and the CSEA, which agreement covered the calendar years 1973 and 1974. Its major provision was its amendment of section 3 ("Vacations") of the 1969 ordinance; it increased the maximum accumulated vacation time to 50 days. Similar to the earlier ordinance, it provided that "[u]nless discharged for cause" there was to be received by an employee "upon the termination of service * * * a cash payment for the monetary value of his accumulated vacation time * * * not to exceed a total of sixty (60) days." The additional 10 days was based upon the new provision that in the computation thereof, credit was to be given to the employee for " 'additional vacation time' in the amount of twenty-five (25%) percent of his sick leave accumulated but unused at the time of such termination, but the sum of such accumulated leave and vacation time which may be accumulated shall not exceed the total of sixty (60) days."

Since this ordinance was an amendment of the 1969 ordinance, it did not repeat those parts of the 1969 ordinance which were unamended. It therefore did not repeat section 2 ("Definitions") of the 1969 ordinance.

*The 1976 Ordinance and Collective Bargaining Agreement*

County Ordinance No. 318-A-1976, dated October 18, 1976

(1976 Proceedings of Board of Supervisors of County of Nassau, 3003-3011), covered *all* of the "WORK RULES AND TERMS AND CONDITIONS OF EMPLOYMENT OF CERTAIN NASSAU COUNTY EMPLOYEES FOR THE CALENDAR YEAR 1976". Section 1 stated that "[t]he terms and conditions of employment for members of the Nassau Chapter of the Civil Service Employees Association for the year commencing January 1, 1976 and terminating December 31, 1976, shall be the same terms and conditions of employment as set forth in the agreement * * * for the 1973-1974 period except as stated in Schedule A, attached hereto and made a part hereof." The relevant part of Schedule A, which is entitled "ACCUMULATED SICK AND VACATION LEAVE ON TERMINATION", provided that "[o]n termination an employee shall be entitled to a maximum total of seventy-five (75) days for both accumulated sick and vacation leave * * * An employee shall be credited with fifty percent (50%) of the amount of accumulated sick leave days and one hundred percent (100%) of the amount of vacation days; however, in no event shall the total exceed seventy-five (75) days."

Schedule A did not change or refer to any portion of the "Definitions" section of the 1973 ordinance.

*The 1977 Ordinance and Collective Bargaining Agreement*

County Ordinance No. 14-D-1977, dated January 4, 1977, related to the subject matter of vacations and sick leaves. Although apparently based on discussions with the CSEA as to the terms of employment for the calendar years 1977-1978, the collective bargaining agreement itself was not signed until March 31, 1977. Nevertheless, said agreement included within its provisions a Schedule "F", which was the text of Ordinance No. 14-D-1977. Similar to the earlier ordinances and agreements, the provisions covered Nassau County employees generally. There was no distinction between court employees and others.

Whereas the previous relevant ordinances stated that they amended the 1969 ordinance, the 1977 ordinance stated that the 1969 ordinance, as amended by the relevant ordinances of the succeeding years, was "hereby repealed". Included in the expansive ordinance was the entirety of the provisions relating to vacations and sick leaves for "officers and employees of the County of Nassau".

The new ordinance repeated verbatim the definitions of the six terms as they had appeared in the 1969 ordinance. This

included the provision that " '[t]ermination of service' means separation from the service of the County."

Paragraph 5 of section 3 of the 1977 ordinance reads:

"Unless discharged for cause, upon termination of service, an officer or employee shall be entitled to cash payment for accumulated vacation time and converted sick leave up to a maximum for both of 85 days. Accumulated sick leave shall be converted for this purpose at the rate of 50% of actual time accumulated up to the maximum provided for in Section 4, subdivision 2 below.

"The maximum accumulation of vacation and sick time shall be fifty-five (55) days of vacation time and one hundred ninety (190) days of sick time."

The ordinance stated that it was effective as of January 1, 1977. The parallel agreement with the CSEA stated that it covered the period January 1, 1977 to December 31, 1978.

## II

### THE COURT UNIFICATION STATUTE

Pursuant to chapter 966 of the Laws of 1976 (approved August 5, 1976 and effective, insofar as is relevant here, on April 1, 1977), the Judiciary Law was amended by the addition of section 220, entitled "Unified court budget; *first instance payments by state;* provision for prepayment; payment by localities; transfer of non-judicial personnel". (Emphasis supplied.)

Section 1 of chapter 966 of the Laws of 1976 explained the reasons for the enactment of section 220 of the Judiciary Law:

"It is hereby found that the responsibility for allocating the cost of operating the courts of the unified court system pursuant to section twenty-nine of article six of the state constitution may best be exercised by means of a unified state budget.

"Every court in the unified court system is currently administered by the state through the administrative board of the judicial conference and the four appellate divisions of the supreme court. It is both uneconomical and inefficient to have the responsibility of funding this state-operated court system divided among various units of local government. This divided funding blurs responsibility and accountability for an effective court system and makes the operation of each of the state

courts dependent upon varying fiscal capabilities of individual local governments.

"Placing at the state level the ultimate fiscal responsibility for the courts of the unified court system enumerated in this act will significantly enhance their effective operation by enabling one legislative body to make decisions concerning the amount of moneys to be appropriated based upon a comprehensive view of the relative needs of the various courts. Funding by a single fiscal authority will enable the allocation of moneys and manpower when needed unimpeded by artificial local boundaries and the diverse competing needs of local governmental agencies. *The state is already significantly involved in the funding of local courts through first instance chargebacks and local assistance programs;* this act will make paramount the state's fiscal control.

"The fiscal crises in the city of New York and other municipalities make a state assumption *of first instance funding* of the state courts all the more urgent. Many state courts are threatened with severe budget cuts that may seriously impair their operation. A unified state court budget will ensure that the limited resources available for courts are allocated according to need and utilized effectively. The legislature is aware that because of these fiscal crises many localities will not be able to finance payment of terminal employment benefits that would vest at the time of placement of court employees on the state payroll, and, therefore, the legislature has provided that payments of terminal employment benefits may be deferred in the manner set forth in this act." (Emphasis supplied.)

Subdivision 1 of section 220 of the Judiciary Law provided, *inter alia,* that beginning April 1, 1977 the State was to pay for the expenses of the Supreme Court, County Courts, Family Courts, Surrogate's Courts, District Courts and the portion of the county clerk's expenses relating to his role as clerk of the court.

By amendment to paragraph (d) of subdivision 6 of section 220 of the Judiciary Law (L 1977, ch 32, § 7, eff April 1, 1977), it was provided: "(i) Any nonjudicial officer or employee of the courts * * * who becomes an employee of the state of New York * * * may, at the option of such officer or employee, be credited with sick leave earned and accumulated but unused at the time he becomes a state employee, but not in excess of two hundred days and shall be credited with vacation leave earned and accumulated but unused at the time he becomes a

state employee, *but not in excess of forty days* * * * *The state shall not award credit or compensation for any other time or leave credits, and shall not be liable for any terminal leave benefits based upon time or leave credits earned prior to April first, nineteen hundred seventy-seven.*" (Emphasis supplied.)

In section 220 (subd 6, par [d], cl [iii]) of the Judiciary Law it was provided that "[a]t the time of retirement or any other permanent separation without fault from the *employment of the state,*" such employee would be entitled to receive *from the political subdivision by whom he had been employed* "payments for terminal leave based upon any time and leave credits accrued before April first, nineteen hundred seventy-seven, and not transferred to the state * * * which payments such nonjudicial officer or employee would otherwise have received from the political subdivision had he retired or separated from the service of the political subdivision on March thirty-first, nineteen hundred seventy-seven. If such officer or employee retires, such entitlement shall include payments he would have received from the political subdivision as if he had been eligible to retire and *as if he had retired on March thirty-first, nineteen hundred seventy-seven.* Such credits shall be payable in cash if such credits would have been so payable by the political subdivision". (Emphasis supplied.)

The amendments to section 220 (subd 6, par [d]) of the Judiciary Law are discussed in the "Memorandum of Office of Court Administration" (McKinney's Session Laws of NY, 1977, pp 2607-2610). The Office of Court Administration had requested that the bill be introduced "to clarify how accumulated but unused time and leave credits are to be treated as of April 1, 1977." The memorandum states *(supra,* p 2608): "Many locally paid employees have accumulated substantial leave credits in the expectation of exchanging them for cash or terminal leave. As the paragraph now reads, however [as the section was originally enacted], this leave must be transferred to the State, which in many instances does not grant the same terminal benefits as are awarded by political subdivisions. Subparagraph (i) therefore provides that the employee have the option to determine the amount of accumulated but unused sick leave he wishes to transfer to the State within the limits set forth by this subdivision. This will allow the employee to use accumulated sick leave as a basis for receiving terminal benefits from the political subdivision based upon

these accumulations. The maximum accumulations permitted to be transferred to the State are now expressly delineated to conform to current State practice, and the paragraph is amended to clarify that *terminal leave payments based upon any time or leave credits earned prior to April 1, 1977, are an obligation of the locality".* (Emphasis supplied.)

As to section 220 (subd 6, par [d], cl [iii]), the memorandum states *(supra,* pp 2608-2609): "Subparagraph (iii) clarifies how accrued time and sick leave is to be treated for terminal leave purposes. If the employee has not transferred unused leave accruals to the State * * * he may use them at the time of his retirement or other permanent separation from State service to receive the compensation that the political subdivision would have awarded on March 31, 1977, for unused accruals upon separation from the service of that political subdivision. *This preserves the employee's right to receive the benefit of a locality's time and leave accrual arrangements for separation which the employee relied upon in determining how he used his time and leave credits."* (Emphasis supplied.)

## III

### THE DIFFERENT TERMINAL LEAVE BENEFITS PURSUANT TO THE COUNTY ORDINANCE AND THE COURT UNIFICATION STATUTE

*As to vacation time that could be accumulated:* Pursuant to County Ordinance No. 14-D-1977, the maximum vacation time that could be accumulated was 55 days. Pursuant to the court unification statute (Judiciary Law, § 220, subd 6, par [d], cl [i], as amd by L 1977, ch 32, § 7), 40 days of unused vacation leave had to be transferred to the State. This meant that an employee who had accumulated more than 40 days vacation time had to leave the excess over 40 days "banked" with the *county,* to be ultimately cashed in when the employee left *State* employment. But beyond that, even as to the 40 days, if he had accumulated them for cash-in purposes only, such intent would be frustrated. Such days, upon transfer to the State, could only be used for future extended vacations, since the statute stated that the State "shall not be liable for any terminal leave benefits [i.e., cash benefits] based upon time or leave credits earned prior to April first, nineteen hundred seventy-seven." (Judiciary Law, § 220, subd 6, par [d], cl [i].)

*As to sick leave time that could be accumulated:* Pursuant

to County Ordinance No. 14-D-1977, the maximum sick leave time that could be accumulated was 190 days. Pursuant to the court unification statute (Judiciary Law, § 220, subd 6, par [d], cl [i]), up to 200 days could be transferred to the State. In this respect the employee's rights were not adversely affected as to future consumption of accumulated unused sick leave days. Nevertheless, the statute divested the employee's right to convert 50% of those days to cash when his employment ultimately would be terminated.

For these reasons, an employee who had accumulated a substantial number of unused sick leave days and more than 40 vacation days for the purpose of cashing in their value when he retired from employment would be encouraged to transfer only a minimum of the transferable days to the State. However, the provision in the court unification statute (Judiciary Law, § 220, subd 6, par [d], cl [iii]), that upon the employee's retirement from *State* employment he was to receive from the *political subdivision* (where he had banked his untransferred leave credits) the payment he "would otherwise have received from the political subdivision had he retired or separated from the service of the political subdivision on March thirty-first, nineteen hundred seventy-seven", as a practical matter, meant that he would be paid less therefor than had there been no court unification since, by reason of inflation, promotions, etc., his per diem salary at the time of his ultimate retirement would probably be substantially greater than the per diem rate he was earning on March 31, 1977. Thus, the combination of the fact that an employee who had "banked" more than 40 days vacation time would be required to retain the excess with the county, and the fact that he would be paid for *all* of his county-retained days, in (let us say) 1990 at his 1977 rate of pay, might lessen his terminal cash benefits because of court unification, although this might be balanced (or overweighed) by the total cash benefits he would receive from the State and the political subdivision when he would ultimately retire.

## IV

### THE INDIVIDUAL CLAIMS

As aforestated, the individual plaintiffs allege that they were "separated from the service of the County of Nassau

effective March 31, 1977" and that "[o]n April 1, 1977 they entered the service of the State of New York."

Plaintiff Stone's claim against the county stated that as of April 1, 1977 he had accumulated 77½ days of sick leave, of which he chose to transfer 37½ days to the State so that there was a balance of 40 days sick leave remaining to his credit with the county. He further stated that he had accumulated 29 days of unused vacation time, none of which he chose to credit to the State, notwithstanding the fact that the 1977 amendment (L 1977, ch 32) mandated transfer of the first 40 days thereof to the State. Since his daily pay rate on April 1, 1977 was $86.8384, he claimed that he was entitled to the sum of $4,255.08, based on the full amount of the untransferred days of accrued vacation time and 50% of the untransferred days of sick leave.

By similar methods of computation plaintiffs Wilkens and Gilbride asserted claims against the county for $5,917.27 and $5,522.86, respectively.

## V

### THE DECISION AT SPECIAL TERM

Special Term granted plaintiffs' motion for summary judgment and held that "[t]he only issue to be determined is the amount of damage sustained by [the individual] plaintiffs". The court quoted the definition of "termination of service", as contained in County Ordinance No. 14-D-1977 (" ' "termination of service" means separation from the service of the County' ") but, in considering its substance and relevance, the court dealt with it as *contractual* provisions for termination pay". (Emphasis added.) It then stated that "[n]either the 1977 collective bargaining agreement nor Ordinance No. 14-D-1977 was amended to provide for deferred termination payments in light of the enactment of Chapter 966 of the Laws of 1976 and the take over of the court system by the State on April 1, 1977." It pointed out that the term "termination of service" was first defined in Ordinance No. 34-1969 and that when "Ordinance No. 14-D-1977 recodified the time and leave rules for County personnel and repealed Ordinance No. 34-1969 [it] did not change the definition for 'termination of service.' "

The essence of the opinion of Special Term is contained in its statement that "[t]he language of the agreement is clear and unambiguous. Such language precludes any conclusion

that the plaintiffs' County service was not terminated at the close of business on March 31, 1977. Accordingly, the right of the plaintiffs to an immediate cash payment vested at that time."

## VI

### IS THERE AMBIGUITY IN THE DEFINITION OF "TERMINATION OF SERVICE"?

Although Special Term recited the fact that the definition appeared originally in a 1969 ordinance, it gave no consideration to what the definition was intended to mean *in 1969.* At that time court unification was no more than an evanescent glow barely visible on the horizon. The 1969 CSEA contract with the county covered the general personnel of the county government, of which court personnel was a comparatively small fraction. It beggars belief that at that time the CSEA intended to insert a time bomb which would detonate in favor of only a fraction of its membership if and when court unification would be enacted. It can be fairly assumed that no one ever intended this innocent-appearing tautology (as vacuous as "[t]he term 'day' is a working day" and "[a] 'seasonal employee' is one who holds a position which has been classified as seasonal by the Nassau County Civil Service Commission") would have the effect of requiring the county, *in one full surge,* to pay terminal leave to court personnel if and when court unification took place. Plaintiffs' able and experienced counsel make no claim that that definition was a culmination of discussions between the county and the CSEA as to what would happen in the event of court unification.

Plaintiffs were performing exactly the same services in the same courts the day the court unification statute took effect that they were performing the day before; all that happened, so far as they were concerned, was a *partial* shift in the source of payment from the county to the State. The shift was only in the *"first instance* payments by the state" (Judiciary Law, § 220). Subdivision 2 of section 220 of the Judiciary Law relates to "the allocation of costs of the courts * * * to each political subdivision". Paragraph (a) thereof contains 119 clauses (among which is clause 28, relating to Nassau County wherein the sum of $14,463,296 is stated as the "Net Local Commitment" and the sum of $401,776 is set forth as "Security Costs"). Paragraph (c) of subdivision 2 states that for the

fiscal year commencing April 1, 1977, "each political subdivision shall repay to the State of New York an amount equal to seventy-five percent of its portion of the amount appropriated in the first instance from the state purposes fund to the judiciary for the state fiscal year commencing April first, nineteen hundred seventy-six" (for the fiscal year commencing April 1, 1978, the percentage was reduced to 50% [L 1978, ch 75]). Paragraph (d) of subdivision 2 provides that "the allocation of costs to each political subdivision for its share of the expenses of the courts * * * shall be determined by law for the fiscal year commencing April first, nineteen hundred seventy-nine, and no allocation of such costs to political subdivisions shall be made for any fiscal year commencing on or after April first, nineteen hundred eighty."

Thus, up to March 31, 1980, Nassau County will still be very much involved, albeit indirectly, in the payroll of its court employees. It is only in a most formalistic sense that the court employees are presently (at least in part) not on the payroll of the county, and are separated from "the service of the county".

The fact is that everything other than the "first instance" periodic duty of payment has remained the same. The transfer of innocent sounding boiler plate in the various ordinances from year to year cannot serendipitously furnish to the plaintiffs a legally viable claim to the windfall they now seek. It is clear that in 1969 the parties to the collective bargaining agreement intended to trigger the right to immediate cash payment of accrued unused vacation and sick leave *only* by a termination of service *involving separation from duties* by reason of dismissal (except for cause), resignation, retirement or death. No one could rationally have assumed that there was any circumstance that would trigger terminal leave payments, in which an employee could continue his services exactly as before and still claim that he was terminated for the purpose of collecting such payments.

It is just too ingenuous and simplistic to apply the 1969 definition in the county ordinance to the 1976 and 1977 statutes relating to court unification, since the adoption of those statutes could not have been within the contemplation of the 1969 negotiators or of the 1969 board of supervisors. Special Term, in effect, faults the 1977 board of supervisors because it "did not change the definition for 'termination of service'" when County Ordinance No. 14-D-1977 recodified the

time and leave rules for county personnel and repealed County Ordinance No. 34-1969. This may have been short-sightedness on the part of the county personnel who negotiated the agreement with the CSEA (and perhaps of the board of supervisors which enacted the 1977 ordinance), but such lack of foresight as to what astute counsel might thereafter claim, cannot translate "termination of service" to mean something of such devastating consequence (upon the county) in 1977 which it did not mean in 1969. As Chief Judge BREITEL said in *New York State Bankers Assn. v Albright* (38 NY2d 430, 436-437): "It has been said often, but with less than meticulous analysis, that an 'unambiguous' statute permits of no inquiry into legislative intention (see, e.g., *McCluskey v Cromwell*, 11 NY 593, 601; accord, e.g., *Matter of Roosevelt Raceway v Monaghan*, 9 NY2d 293, 304, app dsmd 368 US 12; see, generally, McKinney's Cons Laws of NY, Book 1, Statutes, § 120). Absence of facial ambiguity is, however, rarely, if ever, conclusive. The words men use are never absolutely certain in meaning; the limitations of finite man and the even greater limitations of his language see to that. Inquiry into the meaning of statutes is never foreclosed at the threshold; what happens is that often the inquiry into intention results in the conclusion that either there is no ambiguity in the statute, or that for policy or other reasons the prior history will be rejected in favor of the purportedly explicit statement of the statute (see, e.g., *Matter of Barton v Lavine*, 38 NY2d 785). Then it is often said with more pious solemnity than accuracy, that the clarity of the statute precludes inquiry into the antecedent legislative history. As the Supreme Court stated in *United States v American Trucking Assns.* (310 US 534, 543-544): 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. *When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words.* When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use,

however clear the words may appear on "superficial examination". The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion.' (See, e.g., *Le Drugstore Etats Unis v New York State Bd. of Pharmacy,* 33 NY2d 298, 302; *Matter of Astman v Kelly,* 2 NY2d 567, 572; McKinney's Cons Laws of NY, Book 1, Statutes, § 111; 82 CJS, Statutes, § 322, at pp 588-590.)" (Emphasis supplied.)

Similarly, here, without intending to legislate in the guise of interpretation, but looking solely to the circumstances and intent of the contract negotiators and of the board of supervisors when the term "termination of service" was first defined in 1969, and then applying common sense to the question of whether it was intended to have a different meaning in 1973 (per County Ordinance No. 194-1973 which amended the 1969 ordinance and, *sub silentio,* included the 1969 definitions), in 1976 (per Ordinance No. 318-A-1976), and in 1977 (per Ordinance No. 14-D-1977), we must, unless we choose to close our eyes to reality, conclude that Ordinance No. 14-D-1977 and its predecessors (and the parallel collective bargaining agreements) did not award the right to terminal leave payments to personnel of the courts of Nassau County upon the enactment of the court unification statutes.

Whatever merit there may be to plaintiffs' contentions that section 220 (subd 6, par [d]) of the Judiciary Law, by eventually giving them lesser terminal benefits than they would have had if court unification had not been enacted, has unconstitutionally deprived them of a vested right or has impermissibly impaired their contractual rights, must await determination at the time when their services as court employees are in fact terminated and not, as here, merely transferred from one governmental agency to another (but see *Home Bldg. & Loan Assn. v Blaisdell,* 290 US 398, 437; *United States Trust Co. v New Jersey,* 431 US 1; *Gelfert v National City Bank,* 313 US 221, 235; *Allied Structural Steel Co. v*

*Spannaus,* 438 US 234; *East N.Y. Bank v Hahn,* 326 US 230; *Matter of Matson,* 293 NY 476; *Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth.,* 44 NY2d 101). It would therefore be premature for this court, at this time, to declare what the individual plaintiffs' terminal leave rights are as against the county before their services are in fact terminated.

The plaintiffs' contention that their services to the County of Nassau have been terminated when, in fact, they are still employed in the service of the people of the county, is without foundation in law or fact. Thus, spurning technicalities and giving heed to the stark realities of the situation here present, one must conclude that the parties never intended that the County of Nassau, upon court unification, should at one fell swoop, be confronted with a Niagara of numbers.

The order dated February 16, 1978 should be reversed, and plaintiffs' motion for summary judgment denied; judgment should be granted in favor of defendant declaring that persons employed by Nassau County as nonjudicial employees on March 31, 1977 were not terminated from service on that day and that payment of accumulated vacation time and sick leave not transferred to the State did not become due and payable on April 1, 1977; and the complaint should otherwise be dismissed. In the light of this determination, the appeal from the order dated May 17, 1978 should be dismissed as academic.

Suozzi, J. (concurring). I agree with the majority's holding that the plaintiffs herein were not terminated from service with the county, within the meaning of the contract between the Nassau chapter of the Civil Service Employees Association and the County of Nassau, by virtue of the creation of the unified court system as of April 1, 1977. Consequently, plaintiffs were not entitled to an immediate cash payment for all unused vacation and sick leave accumulated with the county as of March 31, 1977.

With respect to plaintiffs' argument that court unification and, specifically, section 220 (subd 6, par [d]) of the Judiciary Law, affords them lesser terminal benefits than they would have had if court unification had not been enacted, and constitutes an unconstitutional impairment of their contract rights with the county, I also agree with the majority's holding that any such attack on the court unification statute is premature and must await resolution at the time when plain-

tiffs are terminated from their service as court employees. It is only at that point that an exact and intelligent determination will be able to be made regarding any claim of impairment of contract rights, especially since some employees may receive greater terminal leave benefits by virtue of court unification than they would have received had unification not been enacted.

Despite my agreement with the majority's holding, I am constrained to file this concurring opinion for the following reason:

In its opinion, the majority states that pursuant to section 220 (subd 6, par [d], cl [i]) of the Judiciary Law, any unused vacation days up to a maximum of 40, which must be transferred by county employees to the State when they become State employees, can only be used during their employment with the State for "future extended vacations". In view of the holding that plaintiffs' constitutional attack is premature, it is totally unnecessary at this juncture to discuss and determine the uses to which these transferred vacation days may be put during plaintiffs' employment in State service. In any event, it is my view, contrary to that adopted by the majority, that these transferred vacation days, up to a maximum of 40, may be used by plaintiffs as credit toward any terminal leave benefits afforded by the State for unused vacation days, which at present, consist of a cash payment for accrued vacation time up to a maximum of 30 days (22 NYCRR 24.1 [b]).

LATHAM, J. P. and COHALAN, J., concur with SHAPIRO, J.; SUOZZI, J., concurs in the result, with an opinion.

Order of the Supreme Court, Nassau County, dated February 16, 1978, reversed, on the law, without costs or disbursements, and plaintiffs' motion for summary judgment denied; judgment is granted in favor of defendant (1) declaring (a) that persons employed by Nassau County as nonjudicial employees on March 31, 1977 were not terminated from service on that day and (b) that payment of accumulated vacation time and sick leave not transferred to the State did not become due and payable on April 1, 1977 and (2) otherwise dismissing the complaint.

Appeal from a further order of the same court, dated May 17, 1978, dismissed as academic, without costs or disbursements, in the light of the determination on the appeal from the order dated February 16, 1978.